BAZELL, APPELLANT, *v.* CITY OF CINCINNATI ET AL, APPELLEES.
HAMILTON COUNTY, OHIO, APPELLEE, *v.* CLOUD, AUDITOR OF
STATE, ET AL.; KELLEY ET AL., APPELLANTS.

(Nos. 41118 and 41386—Decided January 24, 1968.)

Messrs. *Kelley & Grossheim* and Mr. *E. Ronald Grossheim,* for appellant in case No. 41118.

Mr. *William A. McClain,* city solicitor, Mr. *Isabel Guy,* Mr. *William H. Brewe,* Messrs. *Peck, Shaffer & Williams* and Mr. *Judson J. Allgood,* for appellees in case No. 41118.

Messrs. *Peck, Shaffer & Williams,* Mr. *Judson J. Allgood,* Mr. *Andrew J. Conroy* and Mr. *Frederick O. Kiel,* for appellee in case No. 41386.

Mr. *Graham P. Hunt, Jr.,* and Mr. *Robert H. Fosdick,* in *propria personae,* in case No. 41386.

Messrs. *Kelley & Grossheim,* for appellants in case No. 41386.

Taft, C. J. In each case, the record disclosed that the proposed stadium is designed to accommodate large crowds (approximately 50,000) at athletic and other exhibitions, including major league baseball and major league football games.

In the injunction case, it is contended that the city may not erect and maintain the stadium with public funds because the stadium is "designed to peculiarly benefit a few individuals rather than the public in general."

In support of that contention, the plaintiff states that those who will use the stadium are to pay less for that use than will be required to erect and maintain it, and that as a

result a substantial anticipated loss to the city will have to be absorbed by its taxpayers.

There is in the record a report of certain experts as to estimated annual net revenues of about $1,300,000 available for fixed charges on the county's revenue bonds. In arguing that there will be an annual deficit of $700,000 in the amount available for debt charges on the bonds, plaintiff has apparently used a figure of $2,000,000 as representing the amount of those charges. That figure appears to be reasonable. However, there is in the record the proposal to lease the stadium, made by the owners of the major league baseball team known as the Cincinnati Reds. A consideration of this lease with the foregoing report indicates that there may be, if the estimates as to attendance and parking and advertising revenues of the report are correct and no unforeseen complications arise, substantially more net revenue than the amount which the foregoing report had estimated would be received from the major league baseball use of the stadium.

Unfortunately, the evidence, as to anticipated revenues and the requirements for debt service, especially in the absence of any analysis thereof in the brief of either party, is very sparse and quite vague. Thus, we cannot determine from the record whether the proposed stadium operations will or will not provide the city with enough money for payments on its proposed lease from the county. Since the burden of proof was on plaintiff on this issue, we must conclude that the record does not reasonably support a finding that a substantial amount of the rental on the lease from the county will have to be provided for by taxation. Therefore there is no basis in the record for plaintiff's contention that the stadium is "designed to peculiarly benefit a few individuals rather than the public in general."

Plaintiff in the injunction case also contends that the city is not authorized to erect and maintain a stadium, to rent it to private persons for their use and profit, or to rent advertising space on its scoreboard.

In support of these contentions, it is argued that a city is limited in its activities to those specified in the Revised

Code. However, by reason of Sections 3 and 7 of Article XVIII of the Ohio Constitution, a charter city has *all* powers of local self-government, except to the extent that those powers are taken from it or limited by other provisions of the Constitution or by statutory limitations on the powers of a municipality which the Constitution has authorized the General Assembly to impose. See paragraph three of the syllabus of *State, ex rel. Gordon,* v. *Rhodes* (1951), 156 Ohio St. 81, 100 N. E. 2d 225, and *State, ex rel. Bruestle,* v. *Rich* (1953), 159 Ohio St. 13, 110 N. E. 2d 778. For examples of such authorizations of statutory limitations, see Section 13 of Article XVIII and Section 6 of Article XIII of the Ohio Constitution.

As stated in paragraph two of the syllabus of the *Gordon case:*

"The determination of what constitutes a public municipal purpose is primarily a function of the legislative body of the municipality, subject to review by the courts, and such determination by the legislative body will not be overruled by the courts except in instances where that determination is manifestly arbitrary or unreasonable."

In support of these contentions, plaintiff cites *Cleveland* v. *Board of Tax Appeals* (1951), 153 Ohio St. 97, 91 N. E. 2d 480, and *Board of Park Commissioners of Troy* v. *Board of Tax Appeals* (1954), 160 Ohio St. 451, 116 N. E. 2d 725, which followed it. These cases, especially the *Cleveland case,* involved the question whether operations, comparable to the proposed operations of Cincinnati with respect to its stadium, amounted to uses of property such as the stadium *exclusively* for public purposes.

As recognized in *Columbus* v. *Delaware* (1956), 164 Ohio St. 605, 132 N. E. 2d 747; *Cleveland* v. *Board of Tax Appeals* (1958), 167 Ohio St. 263, 147 N. E. 2d 663; and *Graf* v. *Warren* (1967), 10 Ohio St. 2d 32, 225 N. E. 2d 262, there may be public purposes of a proprietary nature.

All opinions in *Cleveland* v. *Board of Tax Appeals,* *supra* (153 Ohio St. 97), recognize that the use of the Cleveland stadium represented a use for public purposes. The majority opinion merely held that there was no *exclusive*

use for such purposes and that such an exclusive use was required for tax exemption.

As stated in my opinion in that case, at page 131:

"In a large city the opportunities for open-air athletics are limited and yet the need therefor is greater than in less congested communities. That need is of the same nature as the need that results in a city providing public parks for its citizens. In this country, baseball and football are national pastimes and a great source of public relaxation and entertainment. No one will question the extent of the public interest in the activities of the Cleveland professional baseball and football teams.

"The construction and operation of modern open-air stadiums have not been developments of private enterprise. They originated in the athletic needs of schools and colleges and have been undertaken generally as municipal functions throughout the country. Even if the development and operation of such an enterprise were left to private initiative, it would require so much governmental policing and regulation that such policing and regulation alone might represent the largest part of its operation. To best answer public needs, such an enterprise should be as near the center of the city as possible. Crowds running up to 85,000 cannot be safely handled in the center of a large city except by public authority. Order must be maintained inside and outside the building. These traffic and police problems and the public evils that might arise from sale of intoxicating liquors and from gambling, if the enterprise were not conducted as a public enterprise, are important factors which justify the conduct of such enterprise at all times under governmental supervision."

In *Cleveland* v. *Carney* (1961), 172 Ohio St. 189, 174 N. E. 2d 254, the syllabus reads:

"A municipal auditorium and exhibit hall owned by a city, staffed and supervised in all its uses by city employees and officials and intended and used for trade shows, conventions, meetings of various civic, religious and educational institutions, and concerts and shows which are open to the public for a fee and which are promoted and con-

ducted by concessionaires for a limited time only is used for the benefit of the public of the city and is 'public property used exclusively for any public purpose' within the meaning of Section 5709.08, Revised Code, and Section 2, Article XII of the Constitution of Ohio.''

Without question, the city would have authority under its home-rule powers to provide parking space adjacent to the stadium. *State, ex rel. Gordon*, v. *Rhodes, supra* (156 Ohio St. 81); *Graf* v. *Warren, supra* (10 Ohio St. 2d 32). See *Columbus* v. *County of Franklin* (1958), 167 Ohio St. 256, 260, 147 N. E. 2d 265.

As to the sale of advertising space on the scoreboard, this obviously will be incidental to the operation of the stadium and would not prevent the proposed operation of the stadium by Cincinnati from being authorized as involving generally a public purpose. See *Carney* v. *Ohio Turnpike Commission* (1958), 167 Ohio St. 273, 147 N. E. 2d 857 (holding "all * * * property * * * comprising * * * Ohio Turnpike * * * and all concomitants connected with its * * * operaton * * * including the parts of plazas leased or rented to private persons and where food and drink are supplied and gasoline, oil and motor-vehicle accessories are furnished * * * although at a profit * * * used *exclusively* for a public purpose"). (Emphasis added.) See also *Toledo* v. *Jenkins* (1944), 143 Ohio St. 141, 54 N. E. 2d 656.

We conclude that a charter municipality may construct a stadium which is designed to accommodate large crowds at athletic and other exhibitions and may rent that stadium to private persons who will provide such exhibitions; that the municipality may do so even though such private persons will derive profits from providing those exhibitions; that, in connection with the construction and operation of such a stadium, a municipality may acquire land and devote it to automobile parking and derive a profit from doing so; and that, as an incident to the construction and operation of such stadium, a municipality may construct and maintain a scoreboard and derive revenue from the sale of advertising space thereon.

In the injunction case, plaintiff complains further

about a part of an agreement between the city and the corporation which owns the Cincinnati Reds baseball club, by which the city agrees to purchase the present baseball park of that team, which is known as Crosley Field, ''at a price to be determined by a jury in an eminent domain procedure but which price shall be not less than two million dollars ($2,000,000).'' This agreement is part of an offer by that corporation to the city, which has been accepted by the city. Under this offer, the foregoing agreement to purchase is apparently (we say apparently because a copy of the offer is not in the record but is only summarized in the ordinance of the city accepting it) part of the consideration to be paid by the city for execution by that corporation of the hereinbefore referred to 40-year lease of the stadium for use during the baseball season.

Although there may be some doubt as to the validity of such an agreement, especially to the extent that it provides for payment of $2,000,000 for Crosley Field even if a jury determines its value to be less than that amount, we do not believe it is necessary for us to determine the validity of that agreement. This is an action to enjoin expenditure of funds on the proposed stadium—not an action to enjoin the foregoing proposed purchase of Crosley Field by the city.

There is nothing in the record to indicate that the invalidity of that agreement, to purchase Crosley Field on the terms specified therein, would substantially affect the determination or the legal authority of the city to proceed with the stadium project, especially since there is no evidence in the record as to the value of Crosley Field.

Finally, the plaintiff in the injunction action contends that the city may not lend its credit to the county for the purpose of enabling the county to borrow money; and that the substantial amount of revenue bonds to be issued by Hamilton County to provide funds for the stadium project will in effect be obligations of the city.

In contending that the city may not so lend its credit, plaintiff relies on the part of Section 6 of Article VIII of the Constitution of Ohio which provides that ''no laws

shall be passed authorizing any county, city [or] town * * * to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or to loan its credit to, or in aid of, any such company, corporation or association * * *."

This court has held that these provisions do not prevent a county from raising money for or lending its credit to a city (*State, ex rel. Speeth,* v. *Carney* [1955], 163 Ohio St. 159, 126 N. E. 2d 449), or to a public organization such as an agricultural society organized to hold annual agricultural fairs (*State, ex rel. Leaverton,* v. *Kerns* [1922], 104 Ohio St. 550, 136 N. E. 217). See also *State, ex rel. Kauer,* v. *Defenbacher* (1950), 153 Ohio St. 268, 91 N. E. 512, so construing a comparable provision against loaning state credit.

In our opinion, although that constitutional provision forbids the lending of a city's credit to or in aid of a private business enterprise, such as that involved in *State, ex rel. Wilson,* v. *Hance* (1959), 169 Ohio St. 457, 159 N. E. 2d 741, it does not prohibit such lending by a city to a public organization such as a county.

We agree that the proposed revenue bonds of Hamilton County will in effect be obligations of the city. Under both the plan considered in the injunction case and the plan disclosed by the record in the bond validation case, Hamilton County is to issue, pursuant to Section 133.06, Revised Code, revenue bonds due serially over a period of 40 years to provide money needed for acquisition of the site and for construction of the stadium project; the city is to convey this site to the county; the county is to pay the city from the proceeds of those bonds money for construction of the stadium project; the city is to arrange for construction of that project; the county is to lease the stadium project to the city for 40 years; the city obligates itself under that lease and the co-operative agreement with the county to pay rent in each year to the county in an amount sufficient to enable the county to pay interest and principal on the bonds that will be due in that year; the county is to have no obligation on its revenue bonds other than to use the rent re-

ceived from the city to pay that interest and principal; and that rent is to be the only source for payment of that interest and principal.

All parties recognize that, if revenues paid to the city by users of the stadium project do not provide the city with enough money to pay the rent, the city is to be obligated to provide the additional money needed.

Thus, in effect, the city has obligated itself to pay rent that will in each year be sufficient to pay the interest and principal that will become due on the county bonds. Therefore, if it may so obligate itself, the proposed revenue bonds of the county will in effect be general obligations of the city.

Plaintiff argues that the city may not so obligate itself because "those residents of the county who also happen to be residents of the city will have their general tax funds used to retire the bonded indebtedness, even though Section 133.06, Revised Code, says that this is illegal." From the brief of the defendants Bazell (plaintiff in the injunction case) and Kelley in the bond validation case and from arguments on behalf of them in that case and on behalf of Bazell in the injunction case, the theory of this argument appears to be that, since the city will be obligated to levy taxes on its taxpayers to raise money necessary to pay the rent and since city taxpayers are also county taxpayers, the county's revenue bonds will not conform with the part of Section 133.06, Revised Code, which is quoted in the brief of Bazell and Kelley in the bond validation case and which states that county revenue bonds "shall not constitute general obligations of the county and the general credit and taxing power of the county shall not be pledged to the payment of any part thereof." However, assuming that these county bonds are general obligations of the city and that the general credit and taxing power of the city is pledged to their payment, it does not follow that these bonds are general obligations of the county or result in a pledge of the general credit and taxing power of the county so as to violate the foregoing relied upon parts of Section 133.06, Revised Code.

In the injunction case, the second amended petition alleges that, in going forward with the stadium project, the city is proposing "to loan its credit beyond authorized debt limitation to Hamilton County" and in its brief in that case in this court plaintiff states that "the real obligor" of the county's revenue bonds is to be the city. However, there is no evidence in the record of that case that would enable a finding as to any debt limitation of the city.

The other questions raised by plaintiff in the injunction case have, on the record before us, insufficient merit to justify any comment by this court.

For the foregoing reasons, the judgment of the Court of Appeals in the injunction case must be affirmed.

In the bond validation case, the reply of the county to the answer of the city states that, if the obligation of Cincinnati to pay rent under the lease from and under the cooperative agreement with the county (which is the only source of payment and security for the revenue bonds which the county proposes to issue) is regarded as part of the "bonds and notes" of Cincinnati within the meaning of Section 133.02, Revised Code, then the city would exceed the maximum net indebtedness that it is authorized to incur under Section 133.03, Revised Code.

By Section 133.03, Revised Code, "the net indebtedness created or incurred by a municipal corporation" is specifically limited to certain percentages "of the total value of all property in such municipal corporation as listed and assessed for taxation."

Thus, the foregoing reply of the county suggests that if the proposed obligation of the city to pay rent is included as an indebtedness of the city in determining its "net indebtedness," the city would exceed the debt limitation imposed upon it by Section 133.03, Revised Code.

In our opinion, we should disregard any question as to whether that debt limitation will be exceeded.

Notwithstanding the foregoing suggestion in the reply of the county, no party before this court in the bond validation case raised any question by brief or argument as to whether the proposed obligation of the city to pay rent

should be included as an indebtedness of the city in determining its "net indebtedness." In other words, any claim of error in not so including that obligation or any question as to whether it should be so included was not raised in this court. As stated in Section 2505.21, Revised Code, "errors not specifically pointed out in the record *and* separately argued by brief may be disregarded." See also Section 4 of Rule II of this court requiring "a concise statement of the questions of law presented."

It is particularly dangerous for a court of last resort to pass upon a claimed error of law, which has not been pointed out to it and briefed by any party, especially where an important question of law is involved. Unless such claimed error has been pointed out by a party and argued by brief, an opposing party has no opportunity to answer the argument or demonstrate that it is without merit. If this court does not disregard such an error, it runs the unnecessary risk of making an erroneous determination on an important question of law—a determinaton which cannot be corrected on any appeal from its judgment.

In the bond validation case, defendants Hunt and Fosdick filed briefs in this court as appellants. Although notices of appeal were filed in the Court of Appeals by those two defendants on December 12, 1967, no copies of those notices were filed by those defendants in this court within 20 days thereafter, as required by Section 1(A) of Rule I, of this court, and hence their appeals are dismissed pursuant to Section 1 of Rule II.

Upon the filing of the notice of appeal by defendants Kelley and Bazell, which claims that a substantial constitutional question is involved in the bond validation case, the Clerk of the Court of Appeals, pursuant to Section 2505.08, Revised Code, and notwithstanding Section 9 of Rule II of this court, certified the record in that case to this court. Hence, this court has considered the record in that case in determining that there is no question of public or great general interest raised therein.

There being no substantial constitutional question raised by defendants Kelley and Bazell in the bond valida-

tion case, their appeal in that case is dismissed *sua sponte*, and their motion to certify the record therein will be overruled.

*Judgment affirmed* in case No. 41118.

*Appeal dismissed* in case No. 41386.

ZIMMERMAN, MATTHIAS, O'NEILL, HERBERT, SCHNEIDER and BROWN, JJ., concur.

ZIMMERMAN, J., concurring. To the writer, it seems unfortunate that a project of the magnitude and cost of the one involved here was not submitted to the electorate of the affected territory for approval or disapproval.

Although the records in these two cases do not disclose it, it may well be that the obligation which the city may have to meet from unvoted tax moneys in connection with the stadium project may be in an amount exceeding the ten-mill tax limitation fixed by law. See Section 5705.02 *et seq.*, Revised Code.

However, as pointed out in the opinion of the court herein, *the manner in which these two cases were presented to the trial court* justified the judgments rendered there and supports the judgments of affirmance rendered by the Court of Appeals and the judgments rendered by this court.