PERKINS ET AL., APPELLANTS, v. STOCKERT ET AL.
APPELLEES.

[Cite as Perkins v. Stockert (1975), 45 Ohio App. 2d 211.]

(No. 4720—Decided March 26, 1975.)

*Mr. James P. Jones,* for appellants.

*Mr. James R. Gould, Mr. Neil F. Freund, Ms. Lillian M. Kern, Mr. Fred M. Izenson, Mr. James W. Drake* and *Mr. F. Thomas Green,* for appellees.

McBRIDE, J. The amended Complaint asks the court to declare unconstitutional all or certain parts of the New Community Organization Act, consisting of R. C. 349.01 through R. C. 349.16, enacted by the legislature in 1972.

It is noted at the outset that R. C. 2721.03 of the declaratory judgment chapter was amended in 1961 to permit any person interested in a contract or other writing constituting a contract to have determined any question of construction or validity arising under such instrument, constitutional provision, statute or the like and to obtain a declaration of rights or other legal relationships. The amendment added the right to a determination of a constitutional question. Under Civil Rule 57, the existence of another adequate remedy does not preclude a judgment for declaratory relief in appropriate cases.

At oral argument, a question arose as to the standing or right of the plaintiffs to initiate this action. This question was waived by Answers, was not decided by the trial court and is not an assignment of error.

The novelty of the questions involved suggests a preliminary review of the purpose and content of the sections embodied in R. C. Chapter 349. The purpose, expressed in R. C. 349.02 is to encourage the orderly development of well planned, diversified, and economically sound new communities and of encouraging the initiative and participation of private enterprise in such undertakings, and cooperation between the developer and the *community authority* to carry out a new community development program. A new community authority is defined, along with other definitions, in R. C. 349.01(D) as a body corporate and politic in this state, established pursuant to R. C. 349.03 and governed by a board of trustees as provided in R. C. 349.-04.

R. C. 349.03 provides for steps to be taken for the initiation of the program and the creation of a community

authority upon the approval of the organizational board of county commissioners. The following section provides for the selection of the initial board of trustees for the new community authority, half by the county commissioners and half by the private developer, plus one member to be appointed by the county commissioners as a representative of local government. It further provides that all appointed members be replaced by elected resident members according to the progress in the development of the new community. Such future members are to be elected by a majority of the *residents* of the new community.

A challenge is made to the method of initial selection. This will be discussed later; however, it is apparent that in turning cornfields into a new community there is at the outset no resident or at least no one living in the district who is interested in the project or its facilities. The development of the abstract concept of an entirely new town with no resident population into a viable community of citizen-residents, separate from but subject to all of the regulations and details of existing local governmental bodies, is no small undertaking and, as expressed in the act, requires the participation of private enterprise, represented by the developer, as defined in R. C. 349.01(E).

The powers of the new community authority, outlined in R. C. 349.06, and the restrictions upon such authority, spelled out in R. C. 349.05, avoid any conflict with the authority of cities, counties, townships, zoning bodies or other local governing commissions or agencies. The balance of R. C. Chapter 349 relates to the operation of the community authority within the new district, as district is defined in R. C. 349.01(C).

Turning to the instant case, the only assignment of error is that the judgment of the trial court in the proceeding on summary judgment is contrary to law in that (a) the court held that R. C. Chapter 349 is not in contravention of Sections 4 and 6, Article VIII of the Ohio Constitution and (b) the court held that the contracts between the private developer and the cities of Dayton and Trotwood are not void.

The procedure for summary judgment is governed by

Civil Rule 56. Subsection (A) provides that a party may "* * * move with or without supporting affidavits for a summary judgment * * *." Subsection (C) provides that a judgment s'hall be rendered if the *pleading*, depositions, answers to interrogatories, written admissions, *affidavits*, transcripts of evidence and written stipulations show there is no genuine issue and the moving party is entitled to a judgment as a matter of law.

The record indicates that since the commencement of this action the Complaint was amended several times. Several Answers and affidavits were filed. A summary judgment was previously granted by the trial court and on appeal that judgment was reversed for the lack of necessary parties. After the additional parties were joined as defendants and a hearing held, a summary judgment was again granted.

The amended Complaint alleges that the organizational board of county commissioners passed a resolution on April 5, 1973, creating a new community authority, encompassing land in Madison and Perry Townships, Montgomery County, Ohio, pursuant to R. C. Chapter 349; that the sections of this chapter are unconstitutional as vague, arbitrary and unreasonable and a delegation of legislative and police power; that the cities of Dayton and Trotwood were requested to take legal action to enjoin the other defendants and the request was rejected; that the developer entered into contracts with each of the two cities in which it was agreed that the cities will take action to annex portions of the land in the new community district and that these contracts are illegal and void as dealing in and bartering for votes contrary to law. Plaintiffs ask for a declaration that R. C. Chapter 349 is unconstitutional and that all action taken pursuant thereto in creating or organizing the new community authority is void.

The various answers admit the allegations as to the creation of a new community authority and the existence of contracts but otherwise deny that the actions were either unconstitutional or unlawful. Affidavits were filed, consisting of legal arguments; admissions of fact, as in the af-

fidavit of Donald L. Huber, filed July 25, 1973; instruments in writing, such as the agreement between Donald L. Huber and the city of Dayton, between Donald L. Huber and the city of Trotwood; an option to sell by one Agnes M. Spatz to Donald L. Huber; and some maps.

The instant motion for summary judgment was filed by the county commissioners, the city of Dayton, the city of Trotwood, Newfields New Community Authority, Donald L. Huber and Joseph G. Madonna. They represent that there is no genuine issue of fact and that they are entitled as a matter of law to a judgment finding R. C. Chapter 349 constitutional and the contracts with the two cities lawful. The trial court granted such judgment and outlined the reasons therefore in a lengthy decision.

Plaintiffs, the appellants herein, assign as error (1) the trial court's failure to find that R. C. Chapter 349 is unconstitutional and (2) the failure to find that the contracts of the developer with the two cities are void. There are no other issues.

1.

Judicial caution suggests that courts hesitate before finding an entire chapter of the statutory laws of Ohio unconstitutional. The sweeping conclusion, proposed by the plaintiffs, must be based upon a finding either that the legislature had no power to enact the laws in the first place or that it did so in such an improper manner as to violate constitutional rights.

R. C. Chapter 349 expresses a worthy and proper purpose of encouraging the orderly development of sound new communities and provides a method whereby this can be done within a geographical district by a single local organization within the framework of all existing governmental controls. The proposition that development and maintenance of a community under a single permanent authority will be more orderly and sound than by thousands of unorganized individual residents requires no argument. Whether such development will provide and maintain a better community or avoid blight and deterioration prevalent in so many areas remains to be seen; however, it can-

not be said that the effort to improve public welfare and to avoid serious and costly community problems in the future is not within the power of the legislature.

Communities have been developed in the past by builders and in the process such builders have formed private community associations or clubs for residents. Such groups survive the operations of their developers and are often left with buildings, recreational areas, facilities and at times utilities, the operation of which is dependent upon the voluntary individual and financial support of residents, often with no plan for an organization or for management. R. C. Chapter 349 recognizes this fact of life in such communities and applies to it legislative encouragement by providing an organization and a method to encourage the development and maintenance of communities by private efforts through a mild form of a public community authority with power limited to such activities as are required by its purpose. The authority created is a corporate body politic, a political organization in the general meaning of the word; however, its powers are restricted to those expressed and its purposes are limited to the interests and welfare of the private residents within the district. The new community authority creates no conflict with existing political subdivisions or authorities. It is a local corporation, clothed with incidents of public operation, for the purpose of improving the welfare of the community. As commanded in R. C. 349.16, Chapter 349 must be liberally construed to further this purpose.

As to the invalidity of the entire chapter, the facts and arguments in this case do not approach the relief which the plaintiffs seek. The purpose of R. C. Chapter 349 is well within legislative power. The creation of an agency to carry out such legislative interest and direction is well within constitutional limits. Accordingly, the trial court did not err in finding that R. C. Chapter 349 is constitutional.

It is a fundamental principle that a chapter or section may be unconstitutional as to a severable part. Accordingly, it is necessary to consider the part, or parts, which the plaintiffs argue may be unconstitutional.

Initially, the plaintiffs contend that portions of Chapter 349 contravene Sections 4 and 6 of Article VIII of the Ohio Constitution. Sections 4 and 6 read, in pertinent part, as follows:

4. "The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual association or corporation whatever; nor shall the state ever hereafter become a joint owner, or stockholder, in any company or association in this state, or elsewhere, formed for any purpose whatever."

6. "No laws shall be passed authorizing any county, city, town, or township, by vote of its citizens, or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever, or to raise money for, or to loan its credit to, or in aid of, any such company, corporation, or association * * *."

It is clear that the state has not in any manner, directly or indirectly, given or loaned its credit to the new community authority and that the state is not and cannot be an owner of stock. There is no stock and only residents can become members. Sections 4 and 6 of Article VIII of the Constitution of Ohio have no application.

In challenging the validity of portions of R. C. Chapter 349, the plaintiffs allude particularly to R. C. 349.06, 349.08, and 349.10, and argue that these sections are subject to the prohibitory provisions of sections 4 and 6. In debating the issue, both sides place considerable emphasis upon the case of *State, ex rel. Saxbe,* v. *Brand,* 176 Ohio St. 44, which discusses an issue similar to the one presented herein. In the *Brand* case, the Supreme Court of Ohio held that the sale of revenue bonds and the use of the proceeds therefrom to make loans to private industry was a prohibited giving or loaning of the credit of Ohio. In that case, however, the proposed loans were to be made to private corporations, and this being so, the court discounted the theory that there can be no prohibited giving or loaning of credit of the state so long as the state does not incur any indebtedness. There, the entire plan, from start to finish, was framed around the credit of the state. The *Brand* case has no application to the present situation.

Here, the meager record fails to disclose that either the state or the New Community Authority is lending its credit to a private corporation or to anyone else. It is a public body created for a public purpose. It is given jurisdiction over community facilities, aesthetics, recreation, education, health, vocational training, and many other related public interests served by its community facilities.

The complaint that some of the sections of R. C. Chapter 349 are arbitrary, unreasonable or vague and uncertain is not only without merit, but they are not specifically raised as a serious question and appear to have been abandoned as arguments in the brief. Nor is there apparent any unconstitutional delegation of legislative or police power of the state or of any of its subdivisions.

Plaintiffs describe the provisions of R. C. 349.06 (E) for service and user fees or other charges as the imposition of a tax. There is no foundation for this in either the statute or the facts. If this section provided for such fees as a tax or lien and used state or local officials to collect them, there would be some merit to this argument.

Although the New Community Organization Act anticipates and encourages the participation of private enterprise, there is no concert of action provided for therein which constitutionally detracts from the wholly autonomous nature of the New Community Authority. The determination of what constitutes a public purpose is primarily a legislative function. *State, ex rel. McClure,* v. *Hagerman,* 155 Ohio St. 320. The fact that private individuals may, and probably will, derive an income or profit is not significant in the determination of what constitutes a public purpose. See *Bazell* v. *Cincinnati,* 13 Ohio St. 2d 63; *State, ex rel. McElroy,* v. *Baron,* 169 Ohio St. 439.

There is no evidence in the record or any language in the applicable statutes to overcome the conclusion of the trial court that the New Community Authority is a public organization created for a public purpose. It is generally accepted that the restrictions of Sections 4 and 6 of Article VIII do not apply to any such organizations. See *State, ex rel. Kauer,* v. *Defenbacher,* 153 Ohio St. 268; *State, ex rel.*

*Leaverton,* v. *Kerns,* 104 Ohio St. 550; *State, ex rel. Speeth,* v. *Carney,* 163 Ohio St. 159.

The power of the General Assembly to enact enabling legislation for the creation of boards, authorities, and other organizations to carry out public functions has been recognized in numerous cases, and the reason therefor is well stated in *State, ex rel. Bryant,* v. *Akron Metropolitan Park District,* 120 Ohio St. 464, as follows:

"In the complexity of our advancing civilization, in the wide differences in conditions in different localities in the same state, and in the ever-changing conditions in a given locality, the legislature has found it necessary to content itself with declaring the principles governing a general public purpose, and to confer upon existing local officials, or upon local boards to be created in a designated manner, the authority to provide, within definite limitations rules and regulations to execute the general purpose expressed in the law itself."

In view of the magnitude of the project, the New Community Authority may encounter difficulties in the future, but a court should not become involved in the suitability of a particular statute, whether another method may be more desirable or whether at some future date a new problem will arise. As stated in *County of Miami* v. *City of Dayton,* 92 Ohio St. 215, 236, the governing principle is as follows:

"This court has nothing to do with the wisdom or unwisdom of the policy involved in the statute. Its duty is ended when it determines the questions as to whether or not any federal or state constitutional provision has been violated, and whether or not the proceedings under the statute have been regular and are agreeable thereto."

It is also fundamental that courts must indulge a strong presumption in favor of the constitutionality of legislation. In order to overcome this presumption, a party must clearly show that the law is invalid in its operation. 10 Ohio Jurisprudence 2d 235, Constitutional Law, Section 158. After examining the facts of this case, the constitutional provisions upon which the plaintiffs rely, and the statutes

under attack, the plaintiffs have failed to establish that R. C. Chapter 349, or any portion to which they refer, contravenes the Constitution of Ohio. The first assignment of error is overruled.

2.

The second assignment of error is that the contracts between the private developer and the cities of Dayton and Trotwood are void and that the trial court was in error in finding to the contrary. Here again, this assignment suffers from the vague generality that must be supplemented by the argument developed in the brief and in the affidavits of the plaintiffs.

On page seven of plaintiffs' brief, we find the claim that the contracts are invalid because they obligate city councilmen and city commissioners to cast their votes for two things: (1) to annex certain real estate encompassed in the area known as New Fields, and (2) to vote for certain zoning laws that will conform to the requirements of the private developer in the new community.

The recitals in the understandings between the developer and the two cities indicate a desire to cooperate in the New Town project—the developer desiring water services and, the city, the annexation of part of the land. The developer agrees to prepare and file a petition for annexation on a portion of the land and to insure that any grantees from him be required to do the same. The city, by its manager, agrees to approve the new community authority, to provide water and sewer lines to the district, to approve zoning substantially identical to that of Montgomery County and the township, and to cooperate with uniform "street furniture," such as street signs, such as may be used in the new town. The city of Dayton's agreement was approved by the city commission, that of Trotwood by the city manager.

Probing these instruments, it is apparent that each party undertakes to initiate the preliminary steps designed to bring to fruition the new town authority as contempated in the statues. It is obvious that the interests, private and governmental, of the developer, the county, two town-

ships and two cities must be brought together by stages if cornfields are to be turned into a viable community. The magnitude of the project, requiring uniformity of zoning and other public functions and services among many local subdivisions, and the finances involved suggest that preliminary understandings of intent and purpose be reached if the embryonic concept is to move ahead and ultimately be adopted by all.

This bringing together of so many interests is within the purpose of R. C. Chapter 349, which is designed to encourage private enterprise in the creation of well planned, diversified and economically sound new communities within the framework of the existing multiple political subdivisions.

R. C. 349.05 restricts the power of the new authority. The power of cities, counties, townships, and of municipal, regional and county planning and zoning commissions and agencies, is expressly preserved. In this case, five local subdivisions are involved, plus all the commissions, agencies and services that each provide. The purpose of the chapter would be defeated if the developer could not secure an initial indication of intent to cooperate on major problems by the chief officers of the subdivisions involved. The undertakings with the two cities do not attempt to reach the details of any of the problems which must ultimately be approved under R. C. 349.05 by the respective authorities of each political subdivision.

The "compelling state interest" in the selection of the initial trustees is expressed in R. C. 349.04. This is accomplished by providing that the initial trustees shall consist of a majority selected by the county commissioners and a minority by the developer. Thereafter, the interest of the state in who serves as a trustee is gradually reduced as the residents come in and take over the full operation. Once the new community is established, the state interest in the selection of trustees is terminated.

Plaintiffs also complain that the developer has, by contract, agreed with the two cities for participation by the cities in the selection of members of the board of trustees

by consenting to submit the names of individuals for their approval out of the minority number assigned by the statute to the appointment of the developer. This is a reasonable arrangement, involving no one's rights other than the statutory right of the developer, and may be said to be in furtherance of the state's interest in a manner not required by the statute. What we have here is an individual statutory right which may be waived.

The principal argument in support of the second assignment of error deals with public policy. The plaintiffs contend that the contracts require the councilmen of Trotwood and the commissioners of Dayton to vote in a certain way upon such matters as zoning and annexation, but a careful examination of the contracts fails to support the premise upon which this contention is predicated. Although it is reasonable to surmise that the city fathers are familiar with the New Fields Project, the written agreements make no attempt to control or interfere with future legislative action. Nor do the contract proposals have any binding effect upon the legislatures, commissions and agencies of the respective cities. The burden of showing that the contracts are contrary to public policy rests with the plaintiffs, but nothing specific with reference to this issue has been established. This second claim of error is overruled. The judgment of the Court of Common Pleas is affirmed.

*Judgment affirmed.*

Kerns, P. J., concurs.
Sherer, J., dissents.

Sherer, J., dissenting. R. C. 349.04 prescribes the method of selection of the board of trustees to exercise the powers of the new community authority which method such section provides "is deemed to be a compelling state interest." Such section provides that the organizational board of commissioners shall appoint at least three, but not more than six, citizen members of the board of trustees to represent the interests of present and future residents of the new community district and one member to serve as

a representative of local government. The section further provides that "the developer shall appoint a number of members equal to the citizen members to serve as representatives of the developer."

The cities of Trotwood and Dayton have entered into contracts with the developer which include an agreement that the members of the board of trustees appointed by the developer shall be approved by such cities.

The majority opinion states:

"This is a reasonable arrangement, involving no one's rights other than the statutory right of the developer, and may be said to be in furtherance of the state's interest in a manner not required by the statute. What we have here is an individual statutory right which may be waived."

I am unable to agree with this conclusion. Since the section makes the method of appointment of trustees a matter of *compelling state interest,* the developer cannot waive the state's interest. The contracts, in this particular, are contrary to the established public policy laid down by the legislature and are void. This court should so hold and should find merit in plaintiffs' second assignment of error.

The trial court, in addition to reasoning that the developer "may waive his right to appoint members of the board of trustees," as mandated by R. C. 349.04, reasons further that the developer may, notwithstanding his agreement to make appointments if approved by the cities, proceed to make appointments without approval.

If he should do so, then the question arises whether the statute is unconstitutional in providing that it is *a matter of compelling state interest* that the developer *shall* appoint members of the board of trustees *to represent his interests.* When the legislature speaks within the powers conferred by the Constitution, its statutes form the public policy of the state.

In addition to mandating the appointment of members of the board of trustees by the developer, R. C. 349.04 (C) provides:

All of the powers of the new community authority shall be exercized by its board of trustees. A majority of the

board shall constitute a quorum, and a concurrence of a majority of a quorum in any matter within the board's duties is sufficient for its determination, provided a quorum is present when such concurrence is had and a majority of those members constituting such quorum are trustees not appointed by the developer. All trustees shall be empowered to vote on all matters within the authority of the board of trustees, and no vote by a member appointed by the developer shall be construed to give rise to civil or criminal liability for conflict of interest on the part of public officials.''

R. C. 349.06(I) empowers the board to contract with the developer for, among other things, *construction of community facilities.* R. C. 349.06(J) permits the new community authority through its board to accept grants, loans and commitments of guarantee, including guarantees of community authority bonds from the United States, the state or other public body and to accept financial assistance as may be provided by federal or state laws.

R. C. 349.08 authorizes a new community authority to issue bonds and notes for the construction of community facilities. R. C. 349.10 authorizes the community authority to secure the payment of such bonds or notes by mortgage on community facilities and by pledge of the income source of the authority.

It is contended by plaintiffs that such sections are unconstitutional as being in violation of Sections 4 and 6, Article VIII of the Ohio Constitution. These sections provide:

4. ''The credit of the state shall not in any manner, be given or loaned to, or in aid of, any individual association or corporation whatever * * *.''

6. ''No laws shall be passed authorizing any county, city, town or township, by vote of its citizens, or otherwise * * * to raise money for, or loan its credit to, or in aid of, any company, corporation or association * * *.''

It is entirely possible that the members of the board of trustees appointed by the developer to *represent the interests of the developer,* with the added vote of a member

of the board of trustees not appointed by the developer, could control the affairs of the new community authority. Such control would make it possible for that majority of a quorum present at any board meeting to contract with the developer for the construction of public facilities which would not be in the public interest but which would be of great assistance to the developer in the development and sale of his private land and buildings. The possession of such power has a tendency to induce the developer's appointees, who are to represent his interests, to act so as to benefit the developer and interferes with the unbiased discharge of the duties of such appointees to act solely in the public interest.

This court should hold that since the developer has such a measure of control the application for and acceptance by the new community authority of loans, grants and guarantees of its bonds by the state or other political subdivision, constitutes a violation of Sections 4 and 6, Article VIII of the Ohio Constitution. It has been held many times that the legislature cannot do indirectly what it cannot do directly.

In *Bazell* v. *Cincinnati*, 13 Ohio St. 2d 63, the court held that the determination of what constitutes a public municipal purpose is primarily a function of the legislative body of the municipality, subject to review by the courts, and such determination by the legislative body will not be overruled by the courts except in instances where that determination is manifestly arbitrary or unreasonable. Such a holding is also applicable to the means of achieving a public purpose authorized by the legislature.

Even though it could be said that the legislation here does not violate the provisions of Article VIII, this court should hold that the provisions of R. C. 349.04, relating to the appointment of members of the board of trustees of a new community authority are arbitrary and unreasonable and not reasonably necessary to the accomplishment of the purposes of R. C. Chapter 349.

Further, this court should conclude that R. C. 349.06 (C), by absolving the members of the board of trustees ap-

pointed by the developer from any civil or criminal responsibility for their actions which may constitute a conflict of interest, as well as the provisions of R. C. 349.04, mandating the appointment by the developer of members of the board of trustees to represent his interests, manifestly represents an arbitrary and unreasonable exercise of legislative power not reasonably necessary to the accomplishment of the purposes of chapter 349 and are, therefore, unconstitutional.

The contracts between Trotwood and Dayton and the developer, in providing that the members of the board of trustees appointed by the developer must have the prior approval of the cities, indicate that they too consider the provisions of R. C. 349.04, relating to appointments by the developer, to be arbitrary and unreasonable and not reasonably necessary to the accomplishment of the purposes of R. C. Chapter 349.

This court should reverse the judgment of the Court of Common Pleas, holding that the aforesaid contracts are not void and in concluding that defendants were entitled to a judgment as a matter of law on all issues posed herein.