[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 381.]

THE STATE EX REL. HUEBNER, APPELLANT, *v*. WEST JEFFERSON VILLAGE COUNCIL ET AL., APPELLEES.

[Cite as *State ex rel. Huebner v. W. Jefferson Village Council*, 1996-Ohio-303.]

*Elections—Reconsideration procedures may be invoked to correct decisions made in error—S.Ct.Prac.R. XI—Determination of number of valid part-petition signatures for placement on ballot of proposed municipal charter amendment—Sections 5, 8, 9, and 14, Article XVIII, Ohio Constitution, construed <u>in pari materia</u>—Writ granted, when.*

(No. 95-58—Submitted April 4, 1995—Decided July 26, 1995—Reconsideration Granted, Judgment Reversed, and Writ Allowed March 6, 1996.)

APPEAL from the Court of Appeals for Madison County, No. CA94-08-030.

ON MOTION FOR RECONSIDERATION.

———————————

{¶ 1} Appellant, David A. Huebner, and other individuals circulated part-petitions to place a proposed charter amendment on the November 8, 1994 ballot for the village of West Jefferson. The amendment would restrict the village in taxing wages originating within its boundaries to a rate of one percent. On July 18, 1994, the petition, which contained 208 valid signatures, was filed with the Clerk of the West Jefferson Village Council. As of that date, there were 2,272 registered voters in the village. The number of registered voters who had voted at the last preceding general municipal election on November 2, 1993 was 482.

{¶ 2} On August 15, 1994, appellees, West Jefferson Village Council members, voted not to certify the part-petitions to the board of elections "for the reason that they are not sufficient in form and in substance." Appellees determined that the petition did not contain sufficient valid signatures because it lacked signatures of at least ten percent of all the electors in the village on the date the

petition was filed, *i.e.,* ten percent of the total number of West Jefferson registered voters (2,272), or 228 valid signatures.

{¶ **3**} On August 19, 1994, Huebner filed a complaint in the Court of Appeals for Madison County for a writ of mandamus compelling appellees to certify the proposed charter amendment to the board of elections for placement of the issue on the ballot for the next regular municipal election. The court of appeals granted appellees' motion for summary judgment and denied the writ, thereby rejecting appellant's contention that the requisite number of signatures was ten percent of the number of registered voters who had voted at the last preceding municipal election, *i.e.*, 49 signatures.

{¶ **4**} On Huebner's *pro se* appeal as of right from the denial of the writ, a four to three majority of this court affirmed the court of appeals. *State ex rel. Huebner v. W. Jefferson Village Council* (1995), 72 Ohio St.3d 589, 651 N.E.2d 1001.

{¶ **5**} The cause is now before the court upon appellant's motion for reconsideration, and motions for leave to intervene in support of appellant's motion filed by the city of Cincinnati and the Secretary of State.

———————————

*S. David Worhatch*, for appellant.

*Betty D. Montgomery,* Attorney General, *Susan E. Ashbrook* and *Andrew S. Bergman*, Assistant Attorneys General, for intervenor Secretary of State.

*Fay D. Dupuis*, City Solicitor, *Robert H. Johnstone*, Deputy City Solicitor, and *Richard Gonulin*, Assistant City Solicitor, for intervenor city of Cincinnati.

———————————

**MOYER, C.J.**

{¶ **6**} Following our July 26, 1995 decision in this cause, appellant retained counsel, who filed the motion for reconsideration here and the complaint for a writ of mandamus in a separate expedited election case, *State ex rel. Ricchiuto v.*

*Reagan*, case No. 95-1679. Both *Ricchiuto* and another expedited election case, *State ex rel. Taxpayers for Accountable Govt. v. Cincinnati City Council*, case No. 95-1714, challenged the validity of *Huebner.* A third expedited election case, *State ex rel. Lewis v. Hamilton Cty. Bd. of Elections*, case No. 95-1689, sought to apply *Huebner* to prevent a previously certified charter amendment proposal from being submitted to the electorate for vote. *Ricchiuto* was resolved when this court denied the writ requested by the relators. *State ex rel. Ricchiuto v. Reagan* (1995), 74 Ohio St.3d 11, 655 N.E.2d 1298. *Taxpayers* and *Lewis* were also subsequently dismissed. *State ex rel. Lewis v. Hamilton Cty. Bd. of Elections* (1995), 74 Ohio St.3d 1201, 655 N.E.2d 177 (entry dismissing cause), 74 Ohio St.3d at 1202-1203, 655 N.E.2d at 177-178 (Moyer, C.J., concurring) and 74 Ohio St.3d at 1203-1205, 655 N.E.2d at 178-179 (Douglas, J., concurring).

{¶ 7} Appellant and the city of Cincinnati[1] now contend on reconsideration that we should vacate our decision in *Huebner* and adopt the position of the dissenting opinion therein or, alternatively, should modify *Huebner* so as to restrict its effect to prospective cases.

{¶ 8} We have invoked the reconsideration procedures set forth in S.Ct.Prac.R. XI to correct decisions which, upon reflection, are deemed to have been made in error. See *State ex rel. Mirlisena v. Hamilton Cty. Bd. of Elections* (1993), 67 Ohio St.3d 597, 622 N.E.2d 329 (reasoning contained in a previous dissenting opinion adopted by a majority of this court pursuant to a motion for reconsideration); *State ex rel. Eaton Corp. v. Lancaster* (1989), 44 Ohio St.3d 106, 541 N.E.2d 64 (views contained in a previous concurring opinion adopted by a majority of this court pursuant to a motion for "rehearing").

---

1. The motions for leave to intervene filed by the city of Cincinnati and the Secretary of State are granted.

**{¶ 9}** The majority *Huebner* opinion reasoned that denial of the requested writ was justified, in part, by the Home Rule Amendment to the Ohio Constitution, which authorizes municipalities "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Section 3, Article XVIII, Ohio Constitution. This justification for denial of the writ was not raised by appellees or discussed by the court of appeals, nor was it fully briefed in this court prior to issuance of our first opinion. We note, additionally, that the discussion of the Home Rule Amendment in our original opinion appears to be contrary to established precedent, and the sole case cited therein appears to be inapposite. *State ex rel. Bedford v. Cuyahoga Cty. Bd. of Elections* (1991), 62 Ohio St.3d 17, 577 N.E.2d 645. See, also, *State ex rel. Semik v. Cuyahoga Cty. Bd. of Elections* (1993), 67 Ohio St.3d 334, 335-336, 617 N.E.2d 1120, 1122, citing *State ex rel. Hinchliffe v. Gibbons* (1927), 116 Ohio St. 390, 395, 156 N.E. 455, 457; *Bazell v. Cincinnati* (1968), 13 Ohio St.2d 63, 42 O.O.2d 137, 233 N.E.2d 864, paragraph one of the syllabus. Appellant now urges us to recognize and reaffirm the principle that subordinate authority must always yield to contrary paramount authority, and hold that municipal charters may not be construed so as to overrule rights guaranteed to the citizens of Ohio by the Ohio Constitution. Upon further reflection, and on this record, we conclude that the Home Rule Amendment cannot support denial of the writ requested in this case.

**{¶ 10}** The second rationale of our *Huebner* decision, and the basis of the court of appeals' decision, is the premise that Section 9, Article XVIII of the Ohio Constitution constitutes a special provision (concerning charter amendments) which is in irreconcilable conflict with the general provision of Section 14, Article XVIII, Ohio Constitution. However, appellant and the *Huebner* dissent argue for a different interpretation of Sections 9 and 14. While Sections 5, 8, and 9 of Article

4

XVIII refer to petitions of "ten per centum of the electors," they do not specify the basis or date upon which the "ten per centum of electors" is to be calculated.

{¶ 11} The court of appeals additionally determined that Section 9 should be deemed to prevail over Section 14 because Section 9 was last amended in 1971. On reconsideration, appellant argues against this view, in that the 1971 amendment to Section 9 did not affect the number of signatures required for submission of a proposed charter amendment to the electorate, but rather authorized notice of proposed charter amendments to be given by newspaper publication and not by mailing. Am.Sub.S.J.R. No. 31, 133 Ohio Senate Journal (1969-1970), at 1508. We agree.

{¶ 12} A majority of this court now concludes that Section 14 is reconcilable with Sections 5, 8, and 9, of Article XVIII for the reasons set forth in the dissent to our first *Huebner* opinion as summarized herein. We hold that, in determining the number of valid part-petition signatures necessary to establish a right to the placement of a proposed amendment of a municipal charter before the voters, Sections 5, 8, 9 and 14, Article XVIII of the Ohio Constitution must be construed *in pari materia*. Accordingly, the percentage of electors required to sign such part-petitions is ten percent of the electors of the municipality based upon the total number of votes cast at the last preceding general municipal election. In the case at bar the relator was therefore required to present 49 valid signatures to create a legal duty on the part of the appellees to certify the proposed amendment for presentation on the ballot. Appellant met and exceeded that requirement by presenting part-petitions that contained 208 valid signatures.

{¶ 13} Our decision is based upon a clear reading and consistent application of the Ohio Constitution. It is also the correct result for reasons of public policy. As appellant contends in his motion for reconsideration, our original opinion precludes electors from knowing the *exact* number of valid signatures required when circulating part-petitions. Under our earlier opinion, the percentage is not

determined until the date the petition is *filed*, and the number of actual electors of a municipality may vary over time based on voter registration drives, annexations, or other events. Conversely, this uncertainty does not exist if Section 14 is applied, since petitioners know the precise number of valid signatures required for submission of the issue to the electorate. Furthermore, this interpretation fosters the goal of providing citizens with access to the ballot, a foundation of our democracy. Moreover, Section 14 was adopted contemporaneously with the pertinent provisions of Sections 5, 8, and 9 of Article XVIII, all of which became effective in 1912, and have been construed *in pari materia* since that time. We note as well that the Secretary of State, the state's chief election officer, has urged this interpretation of the relevant provisions of the Ohio Constitution. (Motion to dismiss, case No. 95-1689, *State ex rel. Lewis, supra*.)

{¶ 14} Having concluded that the reasoning contained in our prior opinion of July 26, 1995 should be rejected, we must now discuss issues which the court of appeals found unnecessary to address in view of its conclusion that appellant failed to present a sufficient number of signatures.

{¶ 15} In addition to an alleged lack of sufficient number of signatures, appellees further justified their refusal to certify the proposed charter amendment based on their conclusion that the petition misled electors and was confusing. However, a municipal legislative authority such as a city or village council lacks authority to consider substantive errors in reviewing the sufficiency of petitions, and is instead limited to reviewing the form of the petition. *State ex rel. Polcyn v. Burkhart* (1973), 33 Ohio St.2d 7, 11-12, 62 O.O.2d 202, 204, 292 N.E.2d 883, 886; *State ex rel. Concerned Citizens for More Professional Govt. v. Zanesville City Council* (1994), 70 Ohio St.3d 455, 457-458, 639 N.E.2d 421, 423; *State ex rel. Citizens for a Better Portsmouth v. Sydnor* (1991), 61 Ohio St.3d 49, 572 N.E.2d 649. Appellees conceded below that they rejected the petition partly based

on its substance. The appellees thereby exceeded their authority, and this proffered alternative basis for rejecting the petition is invalid.

{¶ 16} Where a municipal legislative authority erroneously either fails to submit a charter amendment when it is presented with a legally sufficient petition or fails to make a prompt determination on the sufficiency of the petition within the constitutional time period, this court has issued writs of mandamus to order placement on the next regular election ballot. *Morris v. Macedonia City Council* (1994), 71 Ohio St.3d 52, 641 N.E.2d 1075; *State ex rel. Citizens for a Better Portsmouth v. Sydnor, supra; State ex rel. Jurcisin v.* Cotner (1984), 10 Ohio St.3d 171, 10 OBR 503, 462 N.E.2d 381. A regular primary election is scheduled to occur in this state not less than sixty nor more than one hundred and twenty days from the date of this decision. Cf. Section 8, Article XVIII, Ohio Constitution. We find presentation of the charter amendment issue on the March 1996 primary ballot to be the most equitable resolution of this cause for both relator and the public.

{¶ 17} Pursuant to S.Ct.Prac.R. XI, the timely filing of a motion for reconsideration temporarily relieves the Clerk of this court of the duty to issue a mandate in accordance with the court's judgment. Because the appellant timely filed the instant motion for reconsideration in this cause, no mandate has yet been issued in this action to implement the opinion previously rendered on July 26, 1995 and reported at 72 Ohio St.3d 589, 651 N.E.2d 1001. Pursuant to S.Ct.Prac.R. XI(3)(A)(2), where a motion for reconsideration is timely filed and granted, a mandate is to issue at the time the Supreme Court's judgment entry on reconsideration is entered. Because a majority of this court concludes that the motion for reconsideration in this cause should be granted and that the judgment of the court of appeals should be reversed, the Clerk is instructed to issue a writ of mandamus compelling appellees to certify the proposed charter amendment to the board of elections for placement on the primary election ballot as a special election issue to be presented to the electorate of West Jefferson on March 19, 1996.

*Motion for reconsideration
granted, judgment reversed
and writ granted.*

WRIGHT, PFEIFER and COOK, JJ., concur.

PFEIFER, J., concurs separately.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., dissent.

_____

**PFEIFER, J., concurring.**

{¶ 18} I concur with the legal determinations made by the majority because I do not believe that Section 9, Article XVIII of the Ohio Constitution clearly prevails over Section 14, Article XVIII. The two provisions in the Constitution contradict one another. After reviewing the brief submitted by the intervenor Secretary of State, I conclude that our decision *in State ex rel. Huebner v. W. Jefferson Village Council* (1995), 72 Ohio St.3d 589, 651 N.E.2d 1001, is impractical and that the majority's new approach is the better way to harmonize these conflicting provisions of the Ohio Constitution.

_____

**DOUGLAS, J., dissenting.**

{¶ 19} I respectfully dissent from the judgment and the opinion of the majority because I believe the majority makes not only a fundamental error of law but also a dangerous and unprecedented error of public policy. The damage of today's blow to charter municipalities cannot be overestimated.

{¶ 20} Section 7, Article XVIII of the Ohio Constitution provides that "[a]ny municipality *may frame and adopt or amend* a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government." (Emphasis added.) This is the "home rule" provision of the Ohio Constitution.

8

{¶ 21} Section 9, Article XVIII of the Ohio Constitution sets forth the procedure to be used in *amending* a charter created in accordance with Section 7. Section 9 provides, in pertinent part, that "[a]mendments to *any* charter framed and adopted as herein provided may be submitted to the electors of a municipality by a two-thirds vote of the legislative authority thereof, and, upon *petitions signed by ten per centum* of the *electors* of the municipality setting forth any such proposed amendment, *shall* be submitted by such legislative authority." (Emphasis added.)

{¶ 22} R.C. 3501.01(N) defines "elector." "'Elector' * * * means a person having the qualifications provided by law to be *entitled* to vote." (Emphasis added.) R.C. 3501.01(O) defines "voter." "'Voter' means an elector who *votes* at an election." (Emphasis added.) The difference between a person who is an "elector" and one who is a "voter" is obvious from these definitions.

{¶ 23} Two other sections of Article XVIII of the Constitution use the term "electors" in connection with the right of petition. Section 5 deals with a municipality's efforts "* * * to acquire, construct, own, lease or operate a public utility * * *." The section provides that "[i]f within * * * thirty days a petition signed by *ten per centum of the electors* of the municipality shall be filed with the executive authority thereof demanding a referendum on such ordinance it shall not take effect until submitted to the electors and approved by a majority of those voting thereon." (Emphasis added.)

{¶ 24} Section 8 provides, in part, that "* * * upon petition of *ten per centum of the electors* [the legislative authority of any city or village] shall forthwith, provide by ordinance for the submission to the electors, of the question, 'Shall a commission be chosen to frame a charter.'"

{¶ 25} Thus, Sections 5, 8 and 9 of Article XVIII of the Ohio Constitution provide for petitions signed by ten per centum of the *electors* to place on a ballot matters concerning public utilities, charter commissions and charter amendments. Notwithstanding these clear, unambiguous and mandatory provisions, the majority

today says that signatures of ten per centum of the *electors* are not needed. All that is needed to place these important issues on a ballot for, if successful, inclusion in the charter of a municipality, are the signatures of ten per centum of the persons voting (voters) at the last preceding general municipal election. To arrive at this result, the majority references Section 14, Article XVIII of the Ohio Constitution. If the majority's conclusion is correct, then Section 14 conflicts with Sections 5, 8 and 9, and the specific provisions of Sections 5, 8 and 9 prevail over the general provisions of Section 14. R.C. 1.51. No matter how the majority says it in different ways and no matter how many times the majority says otherwise, the terms "electors" and "voters" cannot be made to mean the same. Our duty is to harmonize such conflicts but, sometimes, harmony is not possible. One could not conceive of harmonizing the hymn "Amazing Grace" with the song "Yellow Submarine." "Electors" are those people registered to vote. "Voters" are those electors who actually vote in a given election.

{¶ 26} Why is any or all of this so important? Because the charter of a city is comparable to a local constitution. In *State ex rel. Bednar v. N. Canton* (1994), 69 Ohio St.3d 278, 281, 631 N.E.2d 621, 624, we said that "[m]any 'matters of local self-government' are, in fact, matters of detail and procedure that are out of place in a charter, which is comparable to a local constitution." We repeated this in the very recent case of *State ex rel. Hipp v. N. Canton* (1996), 75 Ohio St.3d 221, ___, 661 N.E.2d 1090, ___. Yet, today the majority makes it easier to obtain a vote to place a matter in a municipality's constitution than it is to obtain a vote on a simple ordinance. By today's decision, the majority negates, I believe, many municipal charter provisions that we do not, nor cannot, even know exist. Take just two examples.

{¶ 27} In a recent case decided by this court, *Paschal v. Cuyahoga Cty. Bd. of Elections* (1995), 74 Ohio St.3d 141, 656 N.E.2d 1276 (decided by the court on grounds different than the issue now before us in the case at bar), a number of

10

residents of the village of Highland Hills in Cuyahoga County initiated and signed petitions seeking to have placed on the ballot an ordinance that would have prohibited, if the ordinance were passed, any new penal facilities within the village. The petitions were circulated pursuant to Article VI (Initiative, Referendum and Recall) of the charter of the village of Highland Hills.

{¶ 28} Section 1(b), Article VI of the charter of the village states, in part, that: "An initiated ordinance or resolution shall be submitted to Council by a petition signed by qualified *electors equal in number to at least fifteen percent (15%) of the total vote cast in the last regular municipal election.*" (Emphasis added.) Further, a subsequent provision in the same section (Section 1) states that "[i]f the initiative petition is signed by *qualified electors equal in number to at least twenty-five percent (25%) of the total votes cast at the last regular municipal election*, the date of the election may be fixed by the petition." (Emphasis added.) Thus, to initiate an ordinance in Highland Hills, petitions signed by at least fifteen percent of the *electors* of the village who voted in the last regular municipal election must be presented. If the petitioners choose to designate a date for the election, then signatures of twenty-five percent of the total number of people who cast votes cast at the last regular municipal election must be submitted.

{¶ 29} By today's majority decision, it will now be easier to propose the amending of the constitution (charter) of the village of Highland Hills than to initiate an ordinance. Accordingly, if a proposed charter amendment, placed on the ballot, pursuant to today's majority decision, by signatures of ten percent of those *voting* at the last regular municipal election were adopted, then the constitution of the village of Highland Hills would contain the "no new jails" provision. Clearly, the cited provisions of the charter of Highland Hills and all other charters in this state with like or similar provisions are rendered, by a stroke of our pens, inoperative.

{¶ 30} Or, as yet another example, take the charter of the city of Toledo. Section 5, Chapter I of the charter provides for the amending of the charter. The section provides, in part, that "[a]ny amendment to this Charter * * * shall be submitted when a petition is filed with the Clerk of the Council setting forth the proposed amendment and signed by not less than ten percent of the *electors*." (Emphasis added.) Section 6, Chapter I defines "electors" as "residents of the City qualified to vote to fill all elective offices."

{¶ 31} Chapter VI of the charter of the city of Toledo is entitled "Initiative, Referendum and Recall." Section 75, Chapter VI provides for how ordinances may be initiated. The section provides that "[a]ny proposed ordinance may be submitted to the Council by petitions filed with the Clerk and signed by electors of the City *equal in number to twelve percent (12%) of the total number of votes cast for all candidates for Mayor at the most recent general municipal election* at which the Mayor was elected." (Emphasis added.)

{¶ 32} Now suppose a group of well-meaning citizens of Toledo decided that no junk cars may be parked or stored on a residential property, or that no spray paint may be sold to minors because the city has a graffiti problem, or that each cat owned by a citizen must have, like dogs, a license, or that there should be a curfew (there now is) in the city. The citizens set about trying to find the easiest way to have such proposals become the law of the city. They determine that a vote of the people of Toledo is necessary because city council rejects all the citizens' ideas.

{¶ 33} Assume that the last general municipal election was held in November 1993. At that election, there were 172,000[2] registered voters ("electors"). A total of 95,500 electors voted ("voters") and 92,500 of those voted in the mayor's race. If these citizens wanted to initiate an ordinance on any one or all of the matters referenced, they would need (to place the matter on the ballot)

---

2. All numbers have been rounded off.

petitions containing the signatures (pursuant to the charter) of twelve percent of 92,500 or 11,100. If they want their proposal(s) to be in the constitution of the city, then a charter amendment is necessary and, by the terms of Section 5, Chapter I they need the signatures of ten percent of 172,000 (electors) or 17,200. But by today's majority decision, they can decide that it is easier to put "anti-graffiti" in the city constitution because all they now need, to place the question on the ballot as a charter amendment, are petitions containing the signatures of ten percent of 95,500 or 9,550 signatures. Thus, it is now easier to propose amendments to the *charters* of villages and municipalities than it is to initiate an ordinance or resolution.

{¶ 34} It is clear that those persons framing charters know the difference between "electors" and "voters." This is evidenced by the fact that the term "electors" is used and defined, and when the framers of the Highland Hills charter meant "voters," they spelled out "the total vote cast in the last regular municipal election."

{¶ 35} Sir Winston Churchill once said, "I have always considered that the substitution of the internal combustion engine for the horse marked a very gloomy milestone in the progress of mankind." International Dictionary of Thoughts (1969) 586. While some will hail today's majority decision as progress for easy access to the ballot, I can foresee that those governmental subdivisions with charters will consider this day to be a gloomy milestone for their constitutions.

{¶ 36} I respectfully dissent. I would deny the motion for reconsideration and adhere to our decision reported in 72 Ohio St.3d 589, 651 N.E.2d 1001, which affirmed the well-reasoned judgment of the court of appeals. Our prior case was decided on July 26, 1995—less than eight months ago. At least now maybe we will not see any more lectures on *stare decisis*.

RESNICK and F.E. SWEENEY, JJ., concur in the foregoing dissenting opinion.

————————————