**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Gonzales,* Slip Opinion No. 2017-Ohio-777.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-777

THE STATE OF OHIO, APPELLANT, *v*. GONZALES, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Gonzales,* Slip Opinion No. 2017-Ohio-777.]**

*Criminal law—Cocaine-possession offenses—R.C. 2925.11(C)(4)(b) through (f)—*
*State need not prove that weight of cocaine without filler meets the statutory*
*threshold—Motion for reconsideration granted—Judgment reversed.*

(Nos. 2015-0384 and 2015-0385—Submitted February 7, 2017—Decided
March 6, 2017.)

APPEAL from and CERTIFIED by the Court of Appeals for Wood County, No.
WD-13-086, 2015-Ohio-461.

_____

**O'CONNOR, C.J.**

{¶ 1} This matter is before us as a result of a motion for reconsideration filed by appellant, the state of Ohio.[1] Appellee, Rafael Gonzales, filed a memorandum opposing reconsideration.[2]

{¶ 2} In *State v. Gonzales*, __ Ohio St.3d__, 2016-Ohio-8319, ___ N.E.3d ___ ("*Gonzales I*"), the court determined that in prosecuting cocaine-possession offenses under R.C. 2925.11(C)(4)(b) through (f) involving mixed substances, the state must prove that the weight of the actual cocaine, excluding the weight of any filler materials, meets the statutory threshold.

{¶ 3} The state contends that *Gonzales I* was decided in error and that it is based upon inconsistent application of the principles of statutory construction. A majority of the court grants the state's motion for reconsideration. We now hold that the entire "compound, mixture, preparation, or substance," including any fillers that are part of the usable drug, must be considered for the purpose of determining the appropriate penalty for cocaine possession under R.C. 2925.11(C)(4). Accordingly, we vacate our decision in *Gonzales I*, answer the certified-conflict question in the negative, and reverse the judgment of the Sixth District Court of Appeals.

## ANALYSIS

{¶ 4} To interpret a statute, we must first look at its language to determine legislative intent. *Provident Bank v. Wood*, 36 Ohio St.2d 101, 105, 304 N.E.2d 378 (1973). When a statute's meaning is clear and unambiguous, we apply the statute as written. *Id.* at 105-106. We must give effect to the words used, refraining from inserting or deleting words. *Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio

---

[1] Amicus curiae Ohio Prosecuting Attorneys Association supported appellant's request for reconsideration.

[2] Amicus curiae Office of the Ohio Public Defender filed a memorandum opposing reconsideration.

St.3d 50, 53-54, 524 N.E.2d 441 (1988). If a legislative definition is available, we construe the words of the statute accordingly. R.C. 1.42.

{¶ 5} But "words in a statute do not exist in a vacuum." *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 19. This means that "our attention should be directed beyond single phrases, and we should consider, in proper context, all words used by the General Assembly in drafting [the relevant statute] with a view to its place in the overall statutory scheme." *Id.*

{¶ 6} If a statute is ambiguous, the court may consider the legislative history and the circumstances under which it was enacted, as well as the consequences of a particular construction, among other things. R.C. 1.49. And we must presume that the General Assembly intended the entire statute to achieve a result that is feasible of execution. R.C. 1.47.

{¶ 7} R.C. 2925.11(C)(4) describes the cocaine-possession offense: "If the drug involved in the violation is cocaine *or a compound, mixture, preparation, or substance containing cocaine,* whoever violates division (A) of this section is guilty of possession of cocaine." (Emphasis added.) The penalty sections of the statute then set forth increasing degrees of punishment depending on the weight of the cocaine possessed by an offender. R.C. 2925.11(C)(4)(a) through (f). Possession of any amount of the drug exceeding 5 grams is penalized more severely than a fifth-degree felony, *id*., and possession of an amount of the drug exceeding 100 grams is a first-degree felony, in which case the offender is also designated as a major drug offender and the court must impose a mandatory maximum prison term, *id*. at (C)(4)(f).[3]

---

[3] One hundred grams of powder cocaine is approximately 1,000 doses of powder cocaine for intranasal consumption. United States Department of Justice, *Federal Cocaine Offenses: An Analysis of Crack and Powder Penalties* (March 17, 2002), available at https://www.justice.gov/archive/olp/pdf/crack_powder2002.pdf (accessed Feb. 15, 2017).

**{¶ 8}** The question before us is what should be weighed to determine an offender's penalty.

**{¶ 9}** Read as a whole, the plain language of R.C. 2925.11(C)(4)(b) through (f) penalizes an offender for the amount of cocaine possessed, and the amount of "cocaine" clearly encompasses the whole compound or preparation of cocaine, including fillers that are part of the usable drug.

**{¶ 10}** The statutory definition of "cocaine" includes a "salt, compound, derivative, or preparation" of a substance that is a cocaine salt or base cocaine. R.C. 2925.01(X)(3). *See also* R.C. 3719.41 (Schedule II(A)(4)). This language is broad. The Sixth District concluded that the definition of "cocaine" does not include a mixture of cocaine and fillers. 2015-Ohio-461 at ¶ 45. But the statutory definition of cocaine plainly encompasses a compound or preparation that includes cocaine. And "compound" means "something (as a substance * * *) that is formed by a union of * * * ingredients." *Webster's Third New International Dictionary* 466 (1986).

**{¶ 11}** Indeed, this is consistent with the nature of the cocaine used illegally in the United States, which is a compound of several ingredients:

> [C]ocaine powder is derived by dissolving the coca paste in hydrochloric acid and water. To this mixture a potassium salt (potassium permanganate) is added. The potassium salt causes undesired substances to separate from the mixture. These substances are then discarded. Ammonia is added to the remaining solution, and a solid substance—the powder cocaine—separates from the solution. The powder cocaine is removed and allowed to dry. *Prior to distribution, powder cocaine typically is "cut," or diluted, by adding * * * one or more adulterants: sugars, local anesthetics (e.g., benzocaine), other drugs, or other inert*

4

*substances.*  Consequently, the purity level of powder cocaine may

vary considerably.

(Emphasis added and footnotes omitted.)  United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 12 (Feb.1995), http://www.ussc.gov/research/congressional-reports/1995-report-congress-cocaine-and-federal-sentencing-policy (accessed Feb. 15, 2017). *See also* Ohio Substance Abuse Monitoring Network, *Drug Abuse Trends in the Cleveland Region* 81 (Jan.-June 2014), http://www.documentcloud.org/documents/1659531-drug-abuse-trends-in-the-cleveland-region.html#document/p1 (accessed Feb. 15, 2017) (cocaine powder in the Cleveland area is cut with lidocaine, procaine, and levamisole, a livestock dewormer); Ohio Substance Abuse Monitoring Network, *Drug Abuse Trends in the Columbus Region* 102 (Jan.-June 2014), http://mha.ohio.gov/Portals/0/assets/Research/OSAM-TRI/Columbus%20Jan%202015.pdf (accessed Feb. 15, 2017) (in the Columbus area, cocaine is cut with lidocaine, procaine, levamisole, baby laxatives or powder, and "anything that is white and powdered").

{¶ 12} Importantly, the fillers, or adulterants, that are part of powder cocaine are not intended to be removed before consumption.  Indeed, the fillers are an inherent part of powder cocaine.  Thus, the common usage of the term "cocaine" is consistent with the statutory definition that a compound or preparation of cocaine is still cocaine.  Accordingly, the total weight of the drug, including any fillers that are part of usable cocaine, should be weighed to determine the appropriate cocaine-possession penalty under the statute.

{¶ 13} Concluding otherwise would require us to insert the words "actual" or "pure" to describe the cocaine that is intended to be penalized by the statute.  If the General Assembly had been concerned about purity, rather than total weight, it would have said so.  In our limited role of statutory interpretation, we must refrain

from inserting words to achieve a particular result. *Cleveland Elec. Illum. Co.*, 37 Ohio St.3d 50, 524 N.E.2d 441, paragraph three of the syllabus.

{¶ 14} Because we conclude that the statute is unambiguous, legislative history is not controlling here. However, contrary to what Justice Kennedy's dissent asserts, even if the statute were ambiguous, a review of the legislative history and the circumstances under which the statute was enacted would support our conclusion.[4] The Ohio Legislative Service Commission's analysis of Am.Sub.H.B. No. 86, which amended R.C. 2925.11(C)(4), explains that one purpose of the legislation was to eliminate the distinction that had existed between penalties for drug offenses involving crack cocaine and drug offenses involving powder cocaine and replace that distinction with a penalty for drug offenses "involving *any type* of cocaine." (Emphasis added.) Ohio Legislative Service Commission, *Am.Sub.H.B. 86 Final Analysis* ("*Final Analysis*") at 8, available at http://www.lsc.ohio.gov/analyses129/11-hb86-129.pdf (accessed February 16, 2017).

{¶ 15} Moreover, introducing a purity weight requirement for drug offenses involving cocaine would have been a significant departure from the statutory scheme as it had existed and been applied prior to September 2011, the effective date of 2011 Am.Sub.H.B. No. 86. But nowhere in the legislative analysis do the words "pure" or "purity" occur, and nowhere is there a description of the need for prosecutors to weigh the cocaine minus any fillers to determine the applicable

---

[4] In fact, a short time following our decision in *Gonzales I*, legislation was proposed in the General Assembly to amend R.C. 2925.03 and 2925.11 "to provide that in determining the amount of cocaine for trafficking and possession offenses, it also includes a compound, mixture, preparation, or substance containing cocaine." Title, Am.H.B. No. 4, as introduced in the 132d General Assembly, available at Ohio Legislature, House Bill 4, https://www.legislature.ohio.gov/legislation/legislation-summary?id=GA132-HB-4 (accessed February 22, 2017). As unanimously passed by the House, Section 3 of that legislation states, "The General Assembly is aware of [*Gonzales I*]. It was not the intent of the General Assembly to require the State, in prosecuting cocaine offenses involving mixed substances, to prove that the weight of the cocaine meets the statutory threshold, excluding the weight of any filler materials used in the mixture." *Id.*

6

penalty for cocaine possession. In fact, the Legislative Service Commission's analysis explains that the drug-quantity threshold formerly used for cocaine that was not crack cocaine remained the basis for determining whether the major-drug-offender label should apply "regardless of the form of the cocaine involved." *Final Analysis* at p. 68.

**{¶ 16}** We recognize that H.B. 86 contained "the most significant amendments to criminal and prison law since [Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136] took effect in 1996." Diroll, Ohio Criminal Sentencing Commission, *H.B. 86 Summary: The 2011 Changes to Criminal and Juvenile Law*, available at https://www.sconet.state.oh.us/Boards/Sentencing/resources/summaries/HB86Summary.pdf (accessed February 16, 2017). In addition to equalizing penalties for crack and powder cocaine,[5] H.B. 86 raised theft thresholds, expanded diversion

---

[5] The equalization of the penalties for possession of crack and powder cocaine was driven in large part by the need to address the racial disparity in the drug-offender prison population, not by the need to address variances in cocaine purity. This critique of the two-tiered cocaine sentencing approach used prior to H.B. 86 has been widely observed:

> Debates about the sentencing of crack possessors have been contentious for some time because of the disparity between the sentences applicable to crack offenders and those applicable to powder cocaine offenders in most jurisdictions, though crack and powder cocaine are simply different forms of the same drugs. This disparate treatment is usually discussed along racial lines and seen as a main contributor to racial disparities in imprisonment rates. For example, in its 2002 Report to Congress, the U.S. Sentencing Commission found that an "overwhelming majority" of crack offenders were black—91.4% in 1992 and 84.7% in 2000. Like the federal system, blacks have been disproportionately incarcerated in Ohio. The Ohio Office of Criminal Justice Services reported that at midyear 2005, Ohio incarcerated blacks at an alarming rate of 2,196 per 100,000 U.S. residents and incarcerated whites at a rate of 344 per 100,000 U.S. residents. Also similar to the federal system, Ohio law treats crack cocaine offenders much more harshly than it treats powder cocaine offenders.

(Footnotes omitted.) Exum, *Sentencing, Drugs, and Prisons: A Lesson From Ohio*, 42 U.Tol.L.Rev. 881, 886-887 (2011). *See also Kimbrough v. United States*, 552 U.S. 85, 98, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (describing the problems identified by the United States Sentencing Commission with the crack/powder sentencing disparity, including the perception that the system promoted unwarranted disparity based on race).

opportunities, lowered prison terms for certain drug crimes, limited prison time for low-level felonies, encouraged alternatives to prison, and provided mechanisms for shortened prison sentences, among other reforms. Knopp, *Breaking the Cycle: Ohio Reentry Courts*, 41 Ohio N.U.L.Rev. 737, 746 (2015). The legislation spelled out numerous approaches to achieve its goal of reducing the prison population.

{¶ 17} But Justice Kennedy's suggestion in her dissent that H.B. 86 incorporated a requirement that the state must establish proof of the weight of "pure" cocaine in order to reduce the prison population is, at best, speculative. Dissenting opinion at ¶ 61. None of the varied legislative approaches in H.B. 86 included the requirement that the prosecution prove the amount of "pure" cocaine to determine the appropriate cocaine-possession penalty. To the contrary, the Legislative Service Commission's analysis is clear that the amendments did not affect the preexisting statutory scheme except to eliminate the distinction between crack and powder cocaine and provide a "penalty for the offenses involving any type of cocaine." *Final Analysis* at 65-66.

### CONCLUSION

{¶ 18} Giving effect to the statute as a whole and to the intent of the legislature as expressed in the words of the statute, we conclude that the applicable offense level for cocaine possession under R.C. 2925.11(C)(4) is determined by the total weight of the drug involved, including any fillers that are part of the usable drug. Thus, we answer the certified question in the negative, and we reverse the judgment of the Sixth District Court of Appeals.

Motion for reconsideration granted,

and judgment reversed.

O'DONNELL, FRENCH, and DEWINE, JJ., concur.

DEWINE, J., concurs, with an opinion.

FISCHER, J., concurs in part and dissents in part, with an opinion.

KENNEDY, J., dissents, with an opinion.

O'NEILL, J., dissents, with an opinion.

_____

**DEWINE, J., concurring.**

{¶ 19} As the opinion concurring in part and dissenting in part states, reconsideration has traditionally been used " 'to correct decisions which, upon reflection, are deemed to have been made in error.' " Concurring in part and dissenting in part opinion at ¶ 23, quoting *State ex rel. Huebner v. W. Jefferson Village Council*, 75 Ohio St.3d 381, 383, 662 N.E.2d 339 (1996). And S.Ct.Prac.R. 18.02 contemplates that those corrections should come quickly. Parties have just ten days to bring to this court's attention errors the court may have made in arriving at its decision; this court can thus fix a wrongly decided case immediately, before it is relied upon by lower courts and infects the entire justice system.

{¶ 20} A case wrongly decided in late December 2016 is still a case wrongly decided. The state filed its motion for reconsideration on January 3, 2017—to the current court—in accordance with the rule. It is the duty of *this* court to address the motion. And a majority of this court determines that *State v. Gonzales*, __ Ohio St.3d__, 2016-Ohio-8319, ___ N.E.3d ___, is fundamentally flawed. Far better for the administration of justice in Ohio to correct that erroneous holding now than to put off the task for a future case. Reconsideration exists for a very good reason; we should not employ it lightly, but we neglect our duty if we do not employ it to right wrongs when necessary.

_____

**FISCHER, J., concurring in part and dissenting in part.**

{¶ 21} I concur fully in the majority's decision reversing the judgment of the Sixth District Court of Appeals, but I write separately to explain why I do so, despite voting to deny the motion for reconsideration filed by appellant, the state of Ohio.

**{¶ 22}** Today, we announce two separate and distinct decisions in this case. First, the court grants the state's motion to reconsider by a four-to-three vote. I dissent and would deny the motion to reconsider. Second, the court, on the merits of the case, reverses the judgment of the court of appeals by a five-to-two vote. I agree with that decision.

**{¶ 23}** This court's rules of practice provide that "[a] motion for reconsideration shall not constitute a reargument of the case." S.Ct.Prac.R. 18.02(B). Traditionally, this court has used its reconsideration authority to "correct decisions which, upon reflection, are deemed to have been made in error." *State ex rel. Huebner v. W. Jefferson Village Council*, 75 Ohio St.3d 381, 383, 662 N.E.2d 339 (1996).

**{¶ 24}** This court issued a number of decisions at the end of 2016 in which motions for reconsideration were not ripe for review until after the beginning of this year. The timing of these motions places this court in the unusual position of being asked to put itself in the shoes of the previous court to determine whether that court erred in its deliberations to the extent that its decisions need to be corrected. Recognizing that I was not privy to the previous court's deliberations and respecting the precedent established by that court's decisions, I have voted to deny all motions asking this court to reconsider decisions issued before I took my seat on the bench.

**{¶ 25}** Because this court grants the motion for reconsideration in this case, a new question arises that is separate and distinct from the question whether I should vote to grant reconsideration in a case decided by this court before I joined it: once a majority of the court has decided to grant reconsideration in such a case, should I participate in a decision on the merits of that case? I believe that it is my duty to do so.

**{¶ 26}** Each of the justices of this court has been elected by the citizens of Ohio to participate in the cases before the court. An exception to this duty occurs

when one of us feels compelled to disqualify himself or herself. In those cases, a visiting judge is appointed by the chief justice to take the recusing justice's place in the case.

{¶ 27} No ethical considerations prevent me from ruling on the merits of this case. Moreover, even if a visiting judge were to be appointed in my place in this case, that judge would be in a position identical to mine because he or she would not have participated in the original decision on the merits. As an elected member of this court, I have a duty to participate in this case, and there is no compelling reason for me to do otherwise.

{¶ 28} In a sense, participating in the merits of a decision once a majority of the court votes to reconsider the case is no different from my participating in a case that comes before the court as a jurisdictional appeal that was accepted by the court last year and is scheduled for oral argument this year. Although I did not vote to accept jurisdiction in those cases, I am expected to fully participate in the decisions on the merit, and I have done so (except for those cases in which I have recused myself for other reasons). I have also participated in a decision that dismissed a case on the grounds that it had been improvidently accepted. In that case, my vote to dismiss essentially means that, after reconsidering the merits of the case, I determined that the previous court's decision to accept jurisdiction was in error. My participation in the consideration of the merits in this case is similar.

{¶ 29} For these reasons, despite voting to deny the state's motion for reconsideration, I have concluded that it is my duty to participate in the merits decision in this case, and I concur in the majority's decision to reverse the judgment of the court of appeals.

_____

**KENNEDY, J., dissenting.**

{¶ 30} "Decisions are the hardest moves to make, especially when it's a choice between what you want and what is right." Unknown.

**{¶ 31}** This court must respect the fact that the constitutional authority to legislate was conferred solely on the General Assembly, Article II, Section 1, Ohio Constitution, and that it is the province of the General Assembly to make policy decisions, *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 212. It is undisputed that "[j]udicial policy preferences may not be used to override valid legislative enactments." *State v. Smorgala,* 50 Ohio St.3d 222, 223, 553 N.E.2d 672 (1990).

**{¶ 32}** The legislature "is vested with the power to define, classify, and prescribe punishment for offenses committed in Ohio." *State v. Taylor,* 138 Ohio St.3d 194, 2014-Ohio-460, 5 N.E.3d 612, ¶ 12. Accordingly, "[j]udges have no inherent power to create sentences," *id*., and instead "are duty-bound to apply sentencing laws as they are written," *State v. Fischer,* 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 22, citing Griffin & Katz, *Ohio Felony Sentencing Law,* Section 1:3, at 4, fn. 1 (2008).

**{¶ 33}** Because I must adhere to these time-honored principles that define this court's role in our tripartite system of government, I cannot interpret the statutory scheme at issue to conform to my view of what Ohio's public policy should be. Instead, I must interpret the words that the General Assembly chose, using rules of statutory construction. Accordingly, although I might prefer the outcome under the majority's judgment, my fealty to the constitution, our precedent, and this court's role in government require that I dissent from it.

*Motion for Reconsideration*

**{¶ 34}** The state of Ohio has moved for reconsideration of this court's judgment in *State v. Gonzalez*, ___ Ohio St.3d ___, 2016-Ohio-8319, ___ N.E.3d ___ ("*Gonzales I")*. Pursuant to S.Ct.Prac.R. 18.02, we have the authority to "correct decisions which, upon reflection, are deemed to have been made in error." *State ex rel. Huebner v. W. Jefferson Village Council,* 75 Ohio St.3d 381, 383, 662 N.E.2d 339 (1996). "We will not, however, grant reconsideration when a movant

seeks merely to reargue the case at hand." *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 139 Ohio St.3d 212, 2014-Ohio-1940, 11 N.E.3d 222, ¶ 9; S.Ct.Prac.R. 18.02(B) ("A motion for reconsideration shall not constitute a reargument of the case").

**{¶ 35}** In an attempt to present an "obvious error," *see Dublin City Schools* at ¶ 10, the state asserts that the court misapplied the rule of lenity and the canon of strict construction. The state contends that the lead opinion in *Gonzales I* applied the rule of lenity even though it found that the statute was unambiguous. In support, the state cites paragraphs 10 and 20 through 22 of *Gonzales I*. An examination of these paragraphs, however, exposes the fiction of the state's assertion.

**{¶ 36}** The lead opinion's reference to the rule of lenity in *Gonzales I* is *limited* to a general statement that the rule is used to interpret a statute when a statute is determined to be ambiguous. *Id.* at ¶ 10. In that opinion, the reference to the rule occurs before the discussion interpreting R.C. *2925.11(C)(4), the statute at issue in this case*. Starkly absent from the lead opinion's analysis of the statute is application of the rule of lenity. *Id.* at ¶ 20-22. That opinion clearly states that nothing in the statute is deemed ambiguous. *Id.* at ¶ 20, 22 (R.C. 2925.11(C)(4)(b) through (f) is "unambiguous on its face"). The rule of lenity is applied only when a statute is ambiguous. *State v. Arnold*, 61 Ohio St.3d 175, 178, 573 N.E.2d 1079 (1991). Moreover, the lead opinion in *Gonzales I* does not engage in any discussion or application of the rule of lenity when analyzing the statute. Therefore, there is no doubt that the lead opinion did not resolve the statute in favor of the defendant. *Id.* at ¶ 20-22.

**{¶ 37}** The state also argues that the court used a "canon of strict construction" to infer legislative intent. However, this argument is contradicted by the express language of the lead opinion in *Gonzales I*, which states, "The state fails to point to any ambiguity in the statute. Without that, we must simply apply the

13

statute as it is written, *without delving into legislative intent*." (Emphasis added.) *Id.* at ¶ 17.

{¶ 38} Accordingly, the state's arguments are nothing more than red herrings. Failing to point to any obvious error, the state is merely seeking another bite at the apple. The precedent established in *Gonzales I* should not be overturned without a thorough analysis under the tripartite test of *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, in a new case.

{¶ 39} Accordingly, I would deny the state's motion for reconsideration. Nevertheless, because a majority of this court has granted reconsideration in this matter, I will address the merits.

*Analysis of R.C. 2925.11(C)(4)*

{¶ 40} The General Assembly enacted a general provision prohibiting any person from knowingly obtaining, possessing, or using a controlled substance or a controlled-substance analog. R.C. 2925.11(A). Penalties for doing so are based on the class and amount of the controlled substance or controlled-substance analog in an offender's possession. R.C. 2925.11(C).

{¶ 41} At issue here is R.C. 2925.11(C)(4), which provides, "If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine." Thereafter, possession of cocaine is categorized into a degree of felony depending on whether "the amount of the drug involved" equals or exceeds a specific number of grams but is less than a specific number of "grams of cocaine." R.C. 2925.11(C)(4)(b) through (f).

{¶ 42} A court's main objective is to determine and give effect to the legislative intent. *State ex rel. Solomon v. Police & Firemen's Disability & Pension Fund Bd. of Trustees,* 72 Ohio St.3d 62, 65, 647 N.E.2d 486 (1995). The intent of the General Assembly must be determined primarily from the language of the

statute itself. *Stewart v. Trumbull Cty. Bd. of Elections*, 34 Ohio St.2d 129, 130, 296 N.E.2d 676 (1973).

**{¶ 43}** "When the statutory language is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the General Assembly has said." *Jones v. Action Coupling & Equip., Inc.,* 98 Ohio St.3d 330, 2003-Ohio-1099, 784 N.E.2d 1172, ¶ 12, citing *Symmes Twp. Bd. of Trustees v. Smyth,* 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000). However, when statutory language is ambiguous, the rules of statutory interpretation must be applied to determine the intent of the legislature. *Wingate v. Hordge,* 60 Ohio St.2d 55, 58, 396 N.E.2d 770 (1979).

**{¶ 44}** The majority concludes that the statute is unambiguous and that the legislative intent is that the phrase "grams of cocaine" in the subdivision establishing the degree of the offense means "grams of a mixture of cocaine and fillers." To reach this interpretation, however, the majority claims that the mixture of cocaine and adulterants is a compound. R.C. 2925.01(X) (cocaine includes "[a] salt, isomer or derivative * * * or a salt, compound, derivative, or preparation"). It therefore confuses the definition of "compound" with the definition of "mixture." Majority opinion at ¶ 10 (" 'compound' means 'something (as a substance * * *) that is formed by a union of * * * ingredients' "), quoting *Webster's Third New International Dictionary* 466 (1986). In *Gonzales I,* the dissenting opinion concluded that "a compound is a mixture." *Id.,* ___ Ohio St.3d ___, 2016-Ohio-8319, ___ N.E.3d ___, ¶ 42 (C.J. O'Connor dissenting).

**{¶ 45}** The majority is purposefully silent as to the actual effect of its decision and the dangerous precedent it creates, but astute readers of our opinions and those educated and knowledgeable about the rules of statutory construction will not be fooled. By reading the term "mixture" into the term "compound," the majority abandons our strict rules of statutory construction, ignores definitions, and

renders meaningless and superfluous the term "mixture" as used by the General Assembly in this provision and other provisions in the Revised Code.

{¶ 46} The legislature has not defined the terms "compound" or "mixture." R.C. 1.42 states, "Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." The majority's analysis fails to interpret the term "compound" properly. A general dictionary recognizes its definition in the scientific field of chemistry as "a chemically distinct substance formed by union of two or more ingredients (as elements) in definite proportion by weight and with definite structural arrangement (water is a [compound] of oxygen and hydrogen)." *Webster's Third New International Dictionary* 466 (2002). This definition is not interchangeable with the term "mixture," which is defined as "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence—usu. distinguished from * * * compound." *Id.* at 1449.

{¶ 47} " '[W]e may not restrict, constrict, qualify, narrow, enlarge, or abridge the General Assembly's wording.' " *Dillon v. Farmers Ins. of Columbus, Inc.,* 145 Ohio St.3d 133, 2015-Ohio-5407, 47 N.E.3d 794, ¶ 17, quoting *State ex rel. Carna v. Teays Valley Local School Dist. Bd. of Edn.,* 131 Ohio St.3d 478, 2012-Ohio-1484, 967 N.E.2d 193, ¶ 18. Instead, we are to give effect to "every word, phrase, sentence, and part of the statute," *Carna* at ¶ 18-19, avoiding interpretations that would otherwise render a provision redundant, meaningless, or superfluous, *id.* at ¶ 19.

{¶ 48} The majority opinion neglects the effect of its conclusion that the substance created when cocaine and fillers are mixed is a compound. The only reasonable interpretation of the majority's decision is that the majority implicitly

concludes that the term "mixture" has no meaning separate and apart from the term "compound." But the General Assembly has used both terms not only in R.C. 2925.11(C)(4) but in numerous other statutes. *See, e.g.,* R.C. 2925.01(D) and (I), 2925.03(C), 3719.41, and 3719.44.

{¶ 49} Accordingly, in every statute in which the General Assembly has chosen to use both "compound" and "mixture," the effect of the majority's conclusion renders the term "mixture" superfluous. This also means that when the legislature used the terms "compound" and "mixture" in the same sentence of a statute, the use of the term "mixture" was included in vain, not to accomplish a definite purpose. *See State v. Wilson,* 77 Ohio St.3d 334, 336, 673 N.E.2d 1347 (1997). This offends the well-established rule of statutory construction that "when language is inserted in a statute it is inserted to accomplish some definite purpose." *State ex rel. Cleveland Elec. Illum. Co. v. Euclid,* 169 Ohio St. 476, 479, 159 N.E.2d 756 (1959). " 'The presumption always is, that every word in a statute is designed to have *some* effect, and hence the rule that, 'in putting a construction upon any statute, every part shall be regarded, and it shall be so expounded, if practicable, as to give some effect to *every part of it.*' ' " (Emphasis sic.) *Ford Motor Co. v. Ohio Bur. of Emp. Servs.*, 59 Ohio St.3d 188, 190, 571 N.E.2d 727 (1991), quoting *Turley v. Turley*, 11 Ohio St. 173, 179 (1860), quoting *Commonwealth v. Alger*, 61 Mass. 53, 89 (1851).

{¶ 50} Our long precedent of statutory construction establishes that "the General Assembly, in enacting a statute, is assumed to have been aware of other statutory provisions concerning the subject matter of the enactment even if they are found in separate sections of the Code." *Meeks v. Papadopulos,* 62 Ohio St.2d 187, 191-192, 404 N.E.2d 159 (1980), citing *State ex rel. Darby v. Hadaway,* 113 Ohio St. 658, 659, 150 N.E. 36 (1925). The use by the General Assembly of particular language in one part of a statute but not in another part demonstrates that it has

chosen not to make that modification in the latter part of the statute. *See Maggiore v. Kovach,* 101 Ohio St.3d 184, 2004-Ohio-722, 803 N.E.2d 790, ¶ 27.

{¶ 51} While the General Assembly has used both terms in R.C. 2925.11, it has used the term "compound" without using the term "mixture" in other statutes. *See* R.C. 4123.68(C) ("Any industrial process involving the use of lead or its preparations or compounds") and (D) ("Any industrial process involving the use of mercury or its preparations or compounds"); R.C. 5739.01(FFF) (" 'Drug' means a compound, substance, or preparation, and any component of a compound, substance, or preparation * * *"). Therefore, the legislature has demonstrated that it knows how to use these terms, and it has chosen to use only the term "compound" in R.C. 2925.01(X) to define "cocaine."

{¶ 52} If the General Assembly had intended the degree-of-felony classifications to include "compound, mixture, preparation, or substance containing cocaine," then it could have easily included that language in those provisions or changed the definition of "cocaine" to include "mixture." But the legislature did not. Instead, it limited the degree-of-felony classification to "grams of cocaine" only. "Cocaine," of course, is limited by its definition in R.C. 2925.01(X), which does not include the term "mixture." We should not add the term "mixture" to the definition by judicial fiat. *See Clark v. Scarpelli*, 91 Ohio St.3d 271, 291, 744 N.E.2d 719 (2001) (Cook, J., concurring in part and dissenting in part) ("the role of a court is not to decide what the law *should* say; rather, the role of this court is to interpret what the law says *as it has been written by the General Assembly*" [emphasis sic]). As succinctly stated by the court in *Dillon*, this analysis "simply gives effect to the statute as written." 145 Ohio St.3d 133, 2015-Ohio-5407, 47 N.E.3d 794, ¶ 21.

{¶ 53} The majority contends that interpreting the phrase "of cocaine" in R.C. 2925.11(C)(4)(b) through (f) to mean only the drug, not a mixture, "would require us to insert the words 'actual' or 'pure' to describe the cocaine that is

18

intended to be penalized by the statute." Majority opinion at ¶ 13. But this assertion is untrue.

{¶ 54} The certified question recognizes that the issue is whether the state "[m]ust * * * prove that the weight *of the cocaine * * *.*" (Emphasis added.) 143 Ohio St.3d 1402, 2015-Ohio-2747, 34 N.E.3d 131. As argued by Gonzales, "if the relevant weight of cocaine exists in a 'mixture,' it really doesn't matter if the mixture is 10%, 20%, 70% or 99% pure since the offense level is tethered to the weight *of cocaine* within the mixture, not purity *per se.*" (Emphasis sic.) Instead, when the statute is read as written, it requires that the state prove possession of five or more "grams of cocaine," according to the definition of "cocaine" in R.C. 2925.01(X):

> (1) A cocaine salt, isomer, or derivative, a salt of a cocaine isomer or derivative, or the base form of cocaine;
>
> (2) Coca leaves or a salt, compound, derivative, or preparation of coca leaves, including ecgonine, a salt, isomer, or derivative of ecgonine, or a salt of an isomer or derivative of ecgonine;
>
> (3) A salt, compound, derivative, or preparation of a substance identified in   division (X)(1) or (2) of this section that is chemically equivalent to or identical with any of those substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves if the   extractions do not contain cocaine or ecgonine.

This definition does not include filler material. Therefore, the majority's conjecture that an opposing interpretation of the statute requires insertion of the term "purity" is merely an attempt to deflect from the fact that the majority has up-ended established rules of statutory construction to reach its result.

**{¶ 55}** The error of the majority's analysis is also demonstrated when other provisions of the Revised Code are examined. The grammatical framework of the possession-of-cocaine statute is mirrored in other possession statutes. Possession of hashish, R.C. 2925.11(C)(7), and trafficking of hashish, R.C. 2925.03(C)(7), and L.S.D, R.C. 2925.03(C)(5), contain the same language: "If the drug involved in the violation is * * * a compound, mixture, preparation, or substance containing [the respective drug] * * *." Further, the degree-of-felony classifications categorize the violations based on whether "the amount of the drug involved" was a specific weight of hashish, R.C. 2925.11(C)(7) and 2925.03(C)(7), or of L.S.D., R.C. 2925.03(C)(5).

**{¶ 56}** "Hashish" is defined as "the resin or a preparation of the resin contained in marihuana, whether in solid form or in a liquid concentrate, liquid extract, or liquid distillate form." R.C. 2925.01(Z). "L.S.D." is defined as "lysergic acid diethylamide." R.C. 2925.01(Y). Accordingly, it is only the drugs hashish or L.S.D., as defined, that the legislature intended to be quantified to determine the degree of felony for the violation. Nevertheless, the majority's interpretation allows for the degree of felony for possession of cocaine and trafficking in cocaine to be quantified with something other than cocaine, as defined. This is clearly not the intent of the legislature.

**{¶ 57}** In addition to my disagreement with the majority's interpretation of the statute, I also do not agree that the language of the statute is unambiguous. When the language prohibiting possession of cocaine is read in conjunction with the corresponding penalty provision, the statute is ambiguous. *See Symmes*, 87 Ohio St.3d at 553, 721 N.E.2d 1057 (conflict among the appellate courts regarding the meaning of statutory phrase suggests that the language is ambiguous). Moreover, the conflicting interpretations advanced by the lead opinion and the dissent in *Gonzales I,* ___Ohio St.3d ___, 2016-Ohio-8319, ___ N.E.3d ____, are strong support for concluding that the statute is ambiguous.

{¶ 58} When a statute is ambiguous, the court may consider the matters listed in R.C. 1.49 to discern the legislature's intent: the object that the legislature sought to attain, the circumstances surrounding the law's enactment, the law's legislative history, preceding law, the consequences of construing the law in a certain way, and the statute's administrative construction.

{¶ 59} "Although this court is not bound by" the analyses prepared by the Ohio Legislative Service Commission, "we may refer to them when we find them helpful and objective." *Meeks*, 62 Ohio St.2d at 191, 404 N.E.2d 159. The Ohio Legislative Service Commission recognized that one aspect of 2011 Am.Sub.H.B. No. 86 ("H.B. 86") was to eliminate "the distinction between the criminal penalties provided for drug offenses involving crack cocaine and * * * powder cocaine," Ohio Legislative Service Commission, Am.Sub.H.B. 86, *Bill Analysis as Introduced*, at 4, available at http://www.lsc.ohio.gov/analyses129/h0086-i-129.pdf (accessed Feb. 24, 2017), but a second aspect of the law was to remove the presumption of a term of incarceration for fourth-degree-felony drug offenses, Ohio Legislative Service Commission, Am.Sub.H.B. 86, *Final Analysis ("Final Analysis")*, at 8, available at http://www.lsc.ohio.gov/analyses129/11-hb86-129.pdf (accessed Feb. 24, 2017).

{¶ 60} Heralded as a significant piece of legislation that would drastically reduce prison population by ensuring that low-level, nonviolent drug offenders would not be subjected to mandatory prison terms, the director of the Department of Rehabilitation and Correction called H.B. 86 "a day of hope." Johnson, *Law to Cut Prison Population*, Columbus Dispatch (June 30, 2011) 1B.

{¶ 61} The statute signals the legislature's intent to reduce prison population by eliminating presumptive prison sentences for some nonviolent drug offenders: it requires that prosecutors prove the "grams of cocaine" and creates a presumption of incarceration for only those drug offenders who possess the specific number of grams of "cocaine" identified in R.C. 2925.11(C)(4), not those drug

offenders whose product has only "some detectable amount" of cocaine. *Compare State v. Chandler*, 109 Ohio St.3d 223, 2006-Ohio-2285, 846 N.E.2d 1234, syllabus (under R.C. 2925.03(C)(4)(g), substance offered for sale must contain some detectable amount of a controlled substance before an offender can be sentenced as a major drug offender).

**{¶ 62}** Additionally, R.C. 1.49 permits this court to examine preceding law to determine legislative intent. In previous iterations of R.C. 2925.01, "crack cocaine" and "cocaine" were separately defined. The now-deleted definition of "crack cocaine" was "a compound, mixture, preparation, or substance that is or contains any amount of cocaine that is analytically identified as the base form of cocaine or that is in a form that resembles rocks or pebbles generally intended for individual use." Former R.C. 2925.01(GG), 2008 Sub.H.B. No. 195. The definition of "cocaine" remains unchanged; it does not include the term "mixture."

**{¶ 63}** These definitions demonstrate that the legislature knew how to define the term "crack cocaine" to include a mixture and to define the term "cocaine" without using the term "mixture." The General Assembly could have amended the definition of "cocaine" to include the term "mixture" when it deleted the definition of "crack cocaine," but it did not. Accordingly, the legislature intended to not include the term "mixture" in its definition of "cocaine." R.C. 2925.01(X).

**{¶ 64}** This interpretation of the statute is also consistent with the intent to eliminate the sentencing disparity. *Final Analysis* at 9. The General Assembly's intent was to penalize offenders for the amount of the drug cocaine regardless of form. Penalizing an offender for the weight of cocaine, and not the filler material, ensures that offenders are penalized equally. An offender who possesses five grams of cocaine should receive the same penalty as the offender who has five grams of cocaine and ten grams of filler material.

**{¶ 65}** The rule of lenity, codified in R.C. 2901.04(A), must also be considered when a statute is ambiguous. It provides that sections of the Revised Code that define penalties "shall be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A). The rule provides that a court will not interpret a criminal statute to increase the penalty it imposes on a defendant if the intended scope of the statute is ambiguous. *See Moskal v. United States*, 498 U.S. 103, 107-108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990), quoting *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), quoting *Lewis v. United States*, 445 U.S. 55, 65, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (" 'the "touchstone" of the rule of lenity "is statutory ambiguity" ' "); *see also Arnold*, 61 Ohio St.3d at 178, 573 N.E.2d 1079.

**{¶ 66}** Because the statute is ambiguous, the rule of lenity requires that the statute be construed so that it applies only to conduct that is clearly proscribed. Possession of cocaine, or of a "compound, mixture, substance, or preparation" containing cocaine, is proscribed. R.C. 2925.11(C)(4). Possession is a fifth-degree felony. R.C. 2925.11(C)(4)(a). However, if the cocaine equals or exceeds five grams, possession is penalized as a fourth-, third-, second-, or first-degree felony, depending on the amount of the drug, not a compound, mixture, substance, or preparation containing the drug, that is in the offender's possession. In this instance, the degree-of-felony classification for possession of cocaine can only be determined based on the grams of cocaine, as defined in R.C. 2925.01(X), and not filler material.

**{¶ 67}** The state of Ohio argues that "the drafters made a probable slight *faux pas*" in amending the penalty provision and to read the statute in any way other than that the General Assembly requires a mere "aggregate weight" test "belies the legislative intent of the law." This argument demonstrates the weakness of the state's position in concluding that the statute is not ambiguous. A plain and ordinary meaning would not need to be categorized as a blunder or a gaffe.

However, the "faux pas" argument is not credible, because the General Assembly used the same grammatical structure to define the level of felony penalties for possession of hashish and cocaine and trafficking in hashish, L.S.D., and cocaine. But the legislature did not use the same grammatical structure for possession of marijuana and heroin, *see* R.C. 2925.11(C)(3) and (6), and trafficking in marijuana and heroin, *see* R.C. 2925.03(C)(3) and (6). Therefore, it is not a "slight *faux pas*"; the same language is used throughout the statute in such a manner.

{¶ 68} The state of Ohio also argues that interpreting the statute to require proof of the grams of cocaine as defined presents problems because no lab in Ohio conducts a quantitative or purity analysis of substances. However, the confines of statutory construction do not afford the judicial branch latitude to consider policy matters or outcome metrics in determining the meaning of a statute. Our interpretation of a statute cannot be concerned with whether the General Assembly issued an unfunded mandate. Our role is simply to give effect to the legislative intent as divined from the words used by the legislature. *Solomon,* 72 Ohio St.3d at 65, 647 N.E.2d 486.

{¶ 69} The argument of the attorney general, as amicus curiae, that "[t]he mere fact that the State's premiere [sic] crime laboratory is not equipped to perform this analysis suggests that the General Assembly never intended to require purity testing in cocaine prosecutions," is also unconvincing. In contrast to the state's conjecture regarding the General Assembly's intent, the intent of that body and the actions of the crime laboratory are not always aligned. The "state's premier crime laboratory" stopped testing minor-misdemeanor quantities of marijuana in March 2016. Lemon, *BCI's End to Free Testing of Pot Starts Questions,* Toledo Blade (Feb. 13, 2017), available at http://www.toledoblade.com/Police-Fire/2017/02/13/End-to-free-testing-of-pot-starts-questions.html (accessed February 28, 2017). However, the General Assembly has not repealed minor-misdemeanor possession of marijuana. *See* R.C. 2925.11(C)(3)(a).

24

**{¶ 70}** Rightly or wrongly, the General Assembly used the specific language "grams of cocaine," without any qualifiers. If the General Assembly had intended that the penalty for possession of cocaine depended on the weight for the mixture containing the cocaine, and not just the drug cocaine, the General Assembly had the opportunity to specify that requirement. Further, the legislature has the ability to amend the definition of "cocaine" to include the term "mixture," similar to the former definition of "crack cocaine," or amend the penalty provisions to include this language or delete the "of cocaine" language. *See* R.C. 2925.11(C)(3)(b) through (g) (possession of marijuana); R.C. 2925.11(C)(6)(b) through (f) (possession of heroin).

**{¶ 71}** "It is not the role of the courts 'to establish legislative policies or to second-guess the General Assembly's policy choices.' " *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029, 927 N.E.2d 1092, ¶ 35, quoting *Groch,* 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 212. This court must respect the fact that the constitutional authority to legislate was conferred solely on the General Assembly. Article II, Section 1, Ohio Constitution. Consequently, "the only sentence which a trial court may impose is that provided for by statute. A court has no power to substitute a different sentence for that provided for by statute or one that is either greater or lesser than that provided for by law." *Colegrove v. Burns*, 175 Ohio St. 437, 438, 195 N.E.2d 811 (1964). Today, the majority turns its back on these treasured principles of our limited role in government to legislate from the bench.

**{¶ 72}** Therefore, I dissent.

―――――――――

**O'NEILL, J., dissenting.**

**{¶ 73}** Reconsideration of this case is improper. On December 23, 2016, we released *State v. Gonzales*, ___ Ohio St.3d ___, 2016-Ohio-8319, ___ N.E.3d ___ ("*Gonzales I*"). Justice Lanzinger authored a lead opinion that Justice Pfeifer

and I joined. Justice Kennedy authored an opinion concurring in judgment only. Chief Justice O'Connor authored a dissenting opinion that Justices O'Donnell and French joined. Each of the opinions in *Gonzales I* was fully and carefully considered by the seven justices of the court. The only thing that has changed since *Gonzales I* is the makeup of the court. From this day forward, newly seated justices on this court have a license to *reconsider* that which they never *considered* in the first place.

{¶ 74} Under S.Ct.Prac.R. 18.02(B), a motion for reconsideration shall not reargue the case. *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 139 Ohio St.3d 212, 2014-Ohio-1940, 11 N.E.3d 222, ¶ 9. The state's motion for reconsideration is a transparent attempt to win this case, not based on the merits of its arguments, but based on the change in the makeup of this court following the 2016 election. I reject the state's assertion that the lead opinion in *Gonzales I* misapplied any canon of statutory construction to arrive at its holding. Instead, the lead opinion applied the unambiguous language of the statute. *Gonzales I* at ¶ 17, 20, 22. While Justice Kennedy stated that the statute was ambiguous, she concurred in the result requiring that the state prove the weight of the cocaine, not the weight of the cocaine and fillers, when proving the degree of the felony. Thus, a majority of the court in *Gonzales I* addressed the state's arguments regarding what the statute *should* say and concluded that those arguments were insufficient to overcome what the statute clearly *does* say. *Id.*

{¶ 75} Under R.C. 2925.11(C)(4)(a), possession of any amount of cocaine is a fifth-degree felony. To be guilty of a higher degree felony for possession of cocaine under the plain language of subdivisions (C)(4)(b) through (f) of R.C. 2925.11, an offender must possess five or more "grams of cocaine." The statute establishes penalties for the possession of any type or any amount of cocaine, with increasing penalties for increasing quantities. That is the statutory framework that the General Assembly established. But baby formula, talcum powder, and baking

soda, substances commonly mixed with cocaine, are not cocaine. The logic is unassailable. The possession of baby formula, talcum powder, or baking soda does not pose the same risk to the public's health and safety as possession of cocaine does. The wisdom of this statutory framework is not the question to be answered by this court in this case. The statute is unambiguous and must be applied as written.

{¶ 76} *Gonzales I* clearly articulated the correct path for the General Assembly if, in fact, the plain language of the statute does not adequately reflect the intent of the current General Assembly. *Gonzales I* at ¶ 22 (lead opinion) and ¶ 35 (Kennedy, J. concurring in judgment only) (if the General Assembly intended to include a mixture of cocaine and fillers for the weight threshold in the penalties for possession of cocaine, it can change the statute). And as of this writing, it is moving to amend the statute.[6] This is as it should be. " '[W]e must respect that the people of Ohio conferred the authority to legislate solely on the General Assembly.' " *Id*., quoting *State v. South*, 144 Ohio St.3d 295, 2015-Ohio-3930, 42 N.E.3d 734, ¶ 28 (O'Connor, C.J., concurring).

{¶ 77} The court's work in this case was complete on December 23, 2016. A new majority, which includes a justice who took office in 2017, is issuing a decision allowing reconsideration that is not based on any argument that was not expressly addressed in the dissent in *Gonzales I.* There is nothing new here to be reconsidered. The only thing new is the make-up of this court following the November 2016 election. And that change is not sufficient grounds for granting

---

[6] Am.H.B. No. 4 is pending in the 132d Ohio General Assembly. The Ohio Legislative Service Commission Bill Analysis states that as a result of this court's decision in *Gonzales I*, the proposed legislation amends the law to remove the words "of cocaine" from R.C. 2925.03(C)(4)(c) through (g) and R.C. 2925.11 (C)(4)(b) through (f). Ohio Legislative Service Commission, Am.H.B. 4, *Bill Analysis As Passed by the House*, 2, available at https://www.legislature.ohio.gov/download?key=6510&format=pdf.

reconsideration; doing so represents a flagrant departure from our own rules of practice.

**{¶ 78}** To be clear, today's majority opinion does a major disservice to the English language to arrive at a desired result. From this date forward, the statute in question will be read to mean that 2.99 grams of baby powder will now be considered to be 3.00 grams of cocaine if there is even a scintilla of the controlled substance found in the "mixture." Good enough for government work? I think not. I dissent.

_____

Paul A. Dobson, Wood County Prosecuting Attorney, and David T. Harold and Thomas A. Matuszak, Assistant Prosecuting Attorneys, for appellant.

Mayle, Ray & Mayle, L.L.C., Andrew R. Mayle, Jeremiah S. Ray, and Ronald J. Mayle, for appellee.

Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Daniel T. Van, Assistant Prosecuting Attorney; and Dennis P. Will, Lorain County Prosecuting Attorney, and Matthew A. Kern, Assistant Prosecuting Attorney, urging reconsideration for amicus curiae Ohio Prosecuting Attorney's Association.

Timothy Young, Ohio Public Defender, and Carrie Wood, Assistant State Public Defender, opposing reconsideration for amicus curiae Office of the Ohio Public Defender.

_____